UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                     :
SUSAN WHITFIELD, as Administratrix of  :
the Estate of NATHANIEL COBBS, JR.,    :
                                                     :        Before: Richard K. Eaton, Judge[*]
            Plaintiff,                           :
                                                     :        Court No. 08 CV 8516 (RKE)
                  v.                             :
                                                     :        **OPINION and ORDER**
CITY OF NEWBURGH et al.,              :
                                                     :
            Defendants.                        :
------------------------------------------------------x

        Plaintiff Susan Whitfield ("plaintiff") brings this civil rights action as administratrix of

the estate of her deceased son, Nathaniel Cobbs, Jr., asserting claims under 42 U.S.C. § 1983

(2006) and New York State law against the City of Newburgh (the "City") and members of the

Newburgh Police Department: Sergeant Thomas Murphy ("Sergeant Murphy") and Officers

John Buckley ("Officer Buckley"), Christopher Flaherty ("Officer Flaherty"), John Jenerose

("Officer Jenerose"), Howard Ladlee ("Officer Ladlee"), and Robert Vasta ("Officer Vasta")

(collectively, the "Officers").  Plaintiff's action arises out of the events on the afternoon and

night of July 8, 2007, which culminated in Cobbs's death.  Specifically, plaintiff claims: (1) the

Officers used excessive force in violation of the Fourth and Fourteenth Amendments of the

United States Constitution; (2) the Officers failed to intervene on behalf of the decedent in

violation of the Fourth and Fourteenth Amendments of the United States Constitution; and (3)

the City failed properly to train, supervise, and discipline the Officers, giving rise to liability

under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  *See*

--------------------------------

        [*]        Judge Richard K. Eaton, of the United States Court of International Trade, sitting
by designation.

Compl. ¶¶ 31, 33 (ECF Dkt. No. 1).  Plaintiff also alleges a New York State common law tort

claim against defendants for wrongful death.  *See* Compl. ¶ 32.

Defendants now move for summary judgment on all claims pursuant to Federal Rule of

Civil Procedure 56 on the grounds that the force used was objectively reasonable or, in the

alternative, that they are entitled to qualified immunity.  Defs.' Mem. of Law in Supp. of Summ.

J. 18–31, 35–37 (ECF Dkt. No. 72) ("Defs.' Br.").  As to the New York State claim, defendants

argue this claim must be dismissed for plaintiff's failure to comply with the State's notice of

claim requirements.  Defs.' Br. 37–38.  For the reasons that follow, defendants' motion is

granted in part and denied in part.

## BACKGROUND

The facts described below have been taken from the parties' Rule 56.1 statements and are

undisputed.  *See* Defs.' Rule 56.1 Statement (ECF Dkt. No. 61) ("Defs.' 56.1"); Pl.s' Rule 56.1

Reply (ECF Dkt. No. 77) ("Pl.'s 56.1").  Citation to the record is provided where a fact, although

not admitted in the parties' papers, is uncontroverted by record evidence.  The court resolves all

conflicts in the evidence and draws all reasonable inferences in favor of plaintiff, the non-

moving party.  *See Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) ("We 'resolve all

ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought.'" (quoting *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731

F.3d 199, 202 (2d Cir. 2013))).

At the time of the incident, Cobbs was twenty-five years old, stood six feet, five inches

tall, and weighed between 200 and 220 pounds.  Pl.'s 56.1 ¶ 28.  On July 8, 2007, while

intoxicated with alcohol and under the influence of large quantities of phencyclidine ("PCP")

and cocaine, Cobbs forced open the door of Nicole Wheeler's second-story apartment and

entered the premises.  *See* Pl.'s 56.1 ¶¶ 2–3, 141, 145.  Wheeler was Cobbs's former girlfriend

and the mother of his three children.[1]  *See* Pl.'s 56.1 ¶ 2.  What can only be described as a

chaotic scene ensued.  Cobbs grabbed Wheeler and, while choking her, stated "he was going to

die and take her with him."  *See* Pl.'s 56.1 ¶¶ 4–5.  Nicholas Golding, Wheeler's boyfriend at the

time, was in the apartment and intervened by "wrap[ping Cobbs] up because [Cobbs] was going

crazy"; Golding freed Wheeler, who fled the apartment in her underwear and wrapped in a towel.

*See* Pl.'s 56.1 ¶¶ 7, 8, 12; Aff. of David L. Posner, Esq. in Supp. of Mot. for Summ. J. (ECF Dkt.

No. 62) ("Posner Aff."); Posner Aff. Ex. B, at 1 (ECF Dkt. No. 62-2) (signed statement of

Wheeler dated July 8, 2007) ("Wheeler Statement").

     While running from the apartment, Wheeler encountered a neighbor in the stairwell and

told him to call the police.  *See* Pl.'s 56.1 ¶ 9; Wheeler Statement 1; Posner Aff. Ex. C, at 1 (ECF

Dkt. No. 62-3) (signed statement of Robert Herring dated July 9, 2007) ("Herring Statement").

Wheeler returned to her apartment and found Golding and Cobbs still physically engaged on the

ground, and Cobbs "was screaming that he was going to kill [Wheeler's] kids."  *See* Pl.'s 56.1

¶¶ 10–11; Wheeler Statement 2; Suppl. Wheeler Dep. 41:19–42:8 (ECF Dkt. No. 62-31)

("Wheeler Dep.").  Wheeler again fled the apartment, exited the building, and was followed

shortly by Golding, leaving Cobbs alone in the apartment.  *See* Pl.'s 56.1 ¶¶ 12–14.  While

inside, Wheeler observed Cobbs "kick[ ] the leg off the kitchen table."  Wheeler Statement 2.

Banging could be heard throughout the building.  *See* Herring Statement 1.  Now outside,

Wheeler could "hear[] yelling and stuff breaking in the house."  Wheeler Statement 2.  Indeed,

upon returning to her apartment after the incident later that day, Wheeler found her home in

---

[1]     The children were not present during the incident.  *See* Defs.' 56.1 ¶¶ 7, 13–14;
Pl.'s 56.1 ¶¶ 7, 13–14.

disarray, with furniture broken in her bedroom, the children's room, the kitchen, and the living room.  Pl.'s 56.1 ¶ 16.

At 12:24 p.m., five minutes after receiving the 911 call,[2] members of the Newburgh Police Department began arriving at the scene.  *See* Pl.'s 56.1 ¶¶ 17–22.  Police continued to arrive and gather outside the building until around 12:33 p.m.  *See* Pl.'s 56.1 ¶ 22.  At that time, present at the scene were Sergeant Murphy, the ranking officer in charge, as well as Officers Buckley, Flaherty, Jenerose, Ladlee, Vasta, Jamal Lewis ("Officer Lewis"), and Kevin Romero ("Officer Romero").[3]  *See* Pl.'s 56.1 ¶¶ 18–22, 29.  Officer Vasta brought with him a K-9 police dog named "Chuck" who was "trained in the 'bite and hold' method of apprehension."  Pl.'s 56.1 ¶¶ 40, 44.  Officer Buckley was the only officer present equipped with a taser.[4]  *See* Pl.'s 56.1 ¶¶ 80–84; Aff. of Sergeant Joseph Lee ¶ 3 (ECF Dkt. No. 63) ("Lee Aff."); Lee Aff. Ex. A, at 1 (ECF Dkt. No. 63-1) ("Portable Radio/MDT and Equipment Sign-Out Sheet") ("Sign-Out

---

[2]    Police dispatch documents report a "disorderly adult, 'DISADT,' on the second floor of 27 Carter Street."  *See* Aff. of Sergeant Joseph Lee ¶ 5 (ECF Dkt. No. 63) ("Lee Aff.").  At 12:28 p.m., the dispatcher recorded the following message: "Nathaniel Cobbs possibly high on wet and busted through the girl[']s door and stated he would kill her and himself."  Lee Aff. ¶ 8 (capitalization omitted); Pl.'s 56.1 ¶ 23.

[3]    Neither Officer Lewis nor Officer Romero were named as defendants in this action.

[4]    Plaintiff maintains it is possible that, in addition to Officer Buckley, Sergeant Murphy was also equipped with a taser.  *See* Pl.'s 56.1 ¶¶ 80–81.  In support, plaintiff points to Sergeant Murphy's deposition testimony in which he states he could not recall whether he was equipped with a taser on the day in question.  *See* Suppl. Dep. of Sergeant Thomas Murphy 33:17–33:20 (ECF Dkt. No. 62-28) ("Murphy Dep.").  This statement, however, is insufficient on its own to create a genuine factual dispute as to whether Sergeant Murphy or any other officer present at the scene was either equipped with a taser or fired a taser aside from Officer Buckley.  To the contrary, the evidence indisputably establishes that Sergeant Murphy was not equipped with a taser on the day in question, and that there was only one taser assigned to the Officers present at the scene: the taser assigned to Officer Buckley.  *See* Lee Aff. Ex. A, at 1 (ECF Dkt. No. 63-1) ("Portable Radio/MDT and Equipment Sign-Out Sheet") ("Sign-Out Sheet").

Sheet"); Suppl. Dep. of Officer Robert Vasta 39:23–39:24 (ECF Dkt. No. 62-29) ("Vasta Dep.");
Suppl. Dep. of Officer Howard Ladlee 6:5–6:8 (ECF Dkt. No. 62-34) ("Ladlee Dep."); Suppl.
Dep. of Officer Christopher Flaherty 16:14–16:18 (ECF. Dkt. No. 62-36) ("Flaherty Dep.").

Wheeler warned Officer Lewis, the first officer to arrive on the scene, that he should not
approach Cobbs alone because Officer Lewis was too small and it was too dangerous.  *See* Pl.'s
56.1 ¶ 27.  Wheeler told the Officers that Cobbs was "high on PCP" and had threatened "to kill
himself, her and the kids."  Pl.'s 56.1 ¶ 31.  In addition, Wheeler informed the Officers that she
wanted Cobbs arrested and intended to press charges.  Pl.'s 56.1 ¶ 37.  With respect to Cobbs's
arrest, the only accounts as to what occurred inside the apartment are those of the Officers
because there were no other witnesses present.

While gathered outside the apartment building, "[t]he [O]fficers could hear the noise of
breaking furniture and other destruction coming from within the apartment."  Pl.'s 56.1 ¶ 33.
Upon entering the building and advancing up the narrow stairwell leading up to the second floor,
Sergeant Murphy and Officers Buckley, Ladlee, and Vasta heard noises from objects "crashing
and smashing" and other "ruckus inside the apartment."  Pl.'s 56.1 ¶¶ 46, 49; Suppl. Dep. of
Sergeant Thomas Murphy 19:19–22:18 (ECF Dkt. No. 62-28) ("Murphy Dep."); Vasta Dep.
18:2–19:19; Suppl. Dep. of Officer John Buckley Part I, at 15:17–17:13 (ECF Dkt. No. 62-32)
("Buckley Dep. I"); Ladlee Dep. 9:4–11:19.  Officers Flaherty and Lewis remained stationed
downstairs at the entrance to the apartment building, while Officer Jenerose was stationed with
Officer Romero in the rear yard to secure the perimeter.[5]  *See* Flaherty Dep. 17:11–18:3; Aff. of

---

[5]     Plaintiff maintains that, in addition to Sergeant Murphy and Officers Buckley,
Ladlee, and Vasta, there were at least two other officers who went upstairs to the second floor
of the apartment building (i.e., Officers Flaherty and Jenerose).  *See* Pl.'s 56.1 ¶ 46 ("According to
Wheeler, at least six officers went upstairs, one after the other, and she was left alone with
(footnote continued)

Officer Jamal Lewis ¶ 9 (ECF Dkt. No. 70) ("Lewis Aff."); Aff. of Officer John Jenerose ¶ 2

(ECF Dkt. No. 68) ("Jenerose Aff."); Posner Aff. Ex. D, at 4 (ECF Dkt. No. 62-4) (City of

Newburgh Police Department narrative reports filed by Sergeant Murphy and Officers Buckley,

Flaherty, Frederick, Horaz, Jenerose, Ladlee, Lewis, Murphy, Romero, Vasta, and Weaver)

("Officer Narratives").

        Once the Officers reached Wheeler's apartment, Sergeant Murphy stood positioned by

the apartment's closed door and Officers Buckley, Ladlee, and Vasta stood stationed along the

stairwell of the apartment building. *See* Buckley Dep. I, at 18:18–18:25; Ladlee Dep. 9:10–10:9.

Sergeant Murphy forcibly opened the door of the apartment and saw Cobbs in the kitchen. *See*

Officer Narratives 2 ("I [(Sergeant Murphy)] advised . . . Cobbs that he was under arrest and to

open the door. . . . Cobbs did not so I forced the door open."); Buckley Dep. I, at 18:5–18:13

("The door was breached. How it was breached, I don't recall. Either leaning on it or kicking it

open."); Ladlee Dep. 11:23–11:24 ("Sergeant Murphy breached the door. He kicked the door in

or forced the door open."); Murphy Dep. 22:21, 23:7–23:9 ("I kicked the door open."); Vasta

Dep. 19:24–19:25 ("That's when Sergeant Murphy, after several more announcements, forced

---

Officer Lewis."). A review of Wheeler's deposition testimony makes clear, however, that when
asked how many officers she saw enter the apartment, she replied she did not know. *See*
Wheeler Dep. 50:22–51:2 ("Q. Did you see them go inside? A. I seen them go in. Q. How many
officers did you see go in? A. I don't know, like six, seven, eight, I don't know."). This
testimony is insufficient to create a genuine factual dispute as to whether Officers Flaherty and
Jenerose went upstairs and were personally involved in the encounter with Cobbs. Rather, the
only probative evidence on the record is that Officer Flaherty remained downstairs at the
apartment building's entrance and did not go upstairs until after the taser was deployed, while
Officer Jenerose was stationed outside the apartment building throughout the Officers' encounter
with Cobbs. *See* Flaherty Dep. 17:11–17:14 ("Q. Did you go with them? A. No. I stayed down
below. . . . Just for security purposes."); Aff. of Officer John Jenerose ¶ 2 (ECF Dkt. No. 68)
("Jenerose Aff.") ("I was not involved in Mr. Cobbs'[s] arrest nor present inside the apartment. I
was assigned the rear yard to cover any attempt at flight and provide perimeter security. Officer
Romero was with me.").

the door."). Cobbs did not display or retrieve a weapon, or an object that could be used as a weapon; he did, however, rush at the Officers and attempt to prevent them from entering the apartment by pushing the door closed. *See* Officer Narratives 2–3; Buckley Dep. I, at 18:15–18:17, 20:20–20:25; Ladlee Dep. 12:25–13:17; Murphy Dep. 24:24–25:19, 41:22–41:24; Vasta Dep. 20:15–21:3, 52:11–52:13. Sergeant Murphy stopped the door from closing completely by using his body as a wedge. *See* Officer Narratives 2; Buckley Dep. I, at 18:15–18:17; Ladlee Dep. 12:25–13:17; Murphy Dep. 24:24–25:17; Vasta Dep. 20:15–21:3.

With the front door now open, Officer Vasta moved to the entrance of the apartment, holding the K-9 by a leash, and observed Cobbs run across the doorway to the left and out of view. *See* Vasta Dep. 21:4–21:21. Officer Vasta, now unable to see Cobbs, released the K-9 into the apartment by removing the leash from the dog's collar. *See* Vasta Dep. 22:6–23:13, 24:9–24:12 ("Q. I'm asking even before the apprehension by the dog. When you actually release him, is Cobbs visible to you? A. No. I only know that he's to the left of me."); Buckley Dep. I, at 20:17–20:19 ("At that point, he ran to his right, which would be our left, into another room within the apartment."); Ladlee Dep. 13:23–13:25 ("The person disappeared. I didn't see the person again. So I can only assume that [he] ran—it would have been my left, towards the front of the house."); Murphy Dep. 26:18–26:20 ("Q. And then did Cobbs continue on moving somewhere else at that point? A. He went to my left into another room.").

The K-9 entered the apartment and apprehended Cobbs in the living room by repeatedly biting him on the lower body. *See* Pl.'s 56.1 ¶ 68; Officer Narratives 2–3, 5 (Sergeant Murphy writing "K-9 Chuck was deployed and made an apprehension on . . . Cobbs['s] leg"; Officer Buckley noting that "[Officer] Vasta did then deploy his K-9 'Chuck' who apprehended [Cobbs], removing him to the ground"; and Officer Vasta stating "I advised [Cobbs] to get on the ground

and put his hands behind his back, or the K-9 would be deployed.  [Cobbs] refused, at which

time my K-9 did engage [Cobbs], chasing him into the living room and apprehending him in the

right thigh" (capitalization omitted)); Vasta Dep. 25:15–26:8.  Sergeant Murphy and Officers

Vasta, Buckley, and Ladlee followed the K-9 into the apartment.  *See* Pl.'s 56.2 ¶¶ 62–64.  Upon

entering the living room, the Officers found Cobbs engaged with the K-9.  *See* Buckley Dep. I, at

26:25–28:8; Murphy Dep. 29:19–30:3; Vasta Dep. 25:15–26:8.  Cobbs was not in possession of

a weapon, nor did he make any attempt to retrieve one.  *See* Murphy Dep. 41:22–41:24; Vasta

Dep. 52:11–52:13.

Although Cobbs continued to struggle with the K-9, he did not strike any of the Officers.[6]

*See* Officer Narratives 1–7; Murphy Dep. 41:5–41:7.  After Cobbs's struggle with the K-9,

Officer Buckley deployed a taser with model number X26 to Cobbs for a cycle of eleven

seconds.  *See* Pl.'s 56.1 ¶ 76; Aff. of Sergeant Peter VanCura ¶¶ 4, 8 (ECF Dkt. No. 65)

("VanCura Aff."); VanCura Aff. Ex. A, at 2 (ECF Dkt. No. 65-1) ("Taser Download Data").

According to the Officers, because Cobbs continued to struggle by "trying to stand up" and then

"go[ing] onto the ground," "rolling around," "flail[ing] his arms," and "spin[ning] around,"

Officer Buckley applied the taser three more times, for seven seconds, six seconds, and eleven

seconds.  *See* Taser Download Data 2; Murphy Dep. 38:20–38:22 ("That's not the normal thing I

_____

[6]      While Officer Buckley states in his narrative report that Cobbs was kicking and punching the Officers during his altercation with the K-9, Sergeant Murphy testified at his deposition that Cobbs did not strike any officer prior to the deployment of the Taser.  *Compare* Officer Narratives 3 (Officer Buckley writing "[Cobbs] began to fight violently with K-9 'Chuck' kicking and punching both the K-9 and officers attempting to handcuff [Cobbs]"), *with* Murphy Dep. 40:24–41:7 ("Q. Had Cobbs used—had he struck any officer before he was apprehended by the dog? . . . A. No.  Q. Had he struck any officer before the Taser was applied? A. Not to my knowledge.").  Thus, viewing the evidence in the light most favorable to plaintiff, the court finds that Cobbs did not strike any of the Officers.  Indeed, none of the Officers sustained any injuries or sought medical treatment following Cobbs's arrest.  *See* Vasta Dep. 41:18–42:3; Murphy Dep. 25:20–26:8.

saw from Cobbs.  He was still rolling around.  That's why I turned to Buckley and asked him if it was working."); Vasta Dep. 40:19–40:21 ("He was trying to stand up.  Then he would go onto the ground.  He would spin around.  Flail his arms.  It seemed like it wasn't even working at that point."); Suppl. Dep. of Officer John Buckley Part II, at 87:24–88:5 (ECF Dkt. No. 62-33) ("Buckley Dep. II") ("Q. What was Mr. Cobbs doing or not doing that indicated to you that you were not getting compliance?  A. He was still combative.  Still told him to get on the ground.  Not on the ground.  Flailing his arms and legs. Swinging around violently.").  The four taser cycles, which amounted to a total of thirty-five seconds, were administered to Cobbs within less than a one-minute period.  *See* Pl.'s 56.1 ¶¶ 89–91.

After hearing the deployment of the taser, Officer Flaherty, who was stationed downstairs at the apartment building's entrance, moved from his position and went upstairs.  *See* Flaherty Dep. 19:15–19:16, 23:16–23:20.  At this time, Sergeant Murphy with the assistance of Officer Flaherty was able to place Cobbs in handcuffs as he continued to struggle with the Officers.  *See* Ladlee Dep. 21:15–21:20; Murphy Dep. 42:18–43:12; Vasta Dep. 41:7–41:9; Flaherty Dep. 26:20–27:4, 28:23–28:24; Officer Narratives 3 (Officer Flaherty writing "I then assisted [Sergeant] Murphy on putting the handcuffs on [Cobbs]").  Because Cobbs continued to struggle, Sergeant Murphy placed a larger set of cuffs around Cobbs's ankles.  *See* Pl.'s 56.1 ¶ 101; Officer Narratives 2; Ladlee Dep. 22:17–23:9; Murphy Dep. 44:21–45:2.

Cobbs was arrested at 12:42 p.m., carried down the stairs, and placed laying down on his side in the backseat of Officer Jenerose's police car.  *See* Pl.'s 56.1 ¶¶ 24, 101, 110; Murphy Dep. 58:12–16; Jenerose Aff. ¶ 4; Officer Narratives 2.  During the drive to the police station, Cobbs struggled in the backseat, yelling and banging his head on the metal divider separating the front and back seats of the patrol car.  *See* Aff. of Sergeant Paul Horaz ¶ 3 (ECF Dkt. No. 71)

("Horaz Aff."); Jenerose Aff. ¶¶ 6–7; Officer Narratives 4, 6–7 (Officer Jenerose writing "I then drove the suspect to the station and as he began to smash his head into the metal partition separating the drivers compartment and the prisoner area . . . I notified the desk officer as to what was occurring and I activated my emergency beacons and proceeded the rest of the way with a 'Code 3' response."; Officer Frederick observing "[s]everal brownish stains discovered on the security partition on the passenger side were swabbed.  Two brownish areas on the rear driver side interior door were also swabbed."; and Sergeant Horaz writing "at about 1240 hrs [Officer] Jenerose radioed that he was transporting a disorderly arrestee . . . to police HQ and that Cobbs was hitting his head against the vehicle's rear passenger area partition.").

Officer Jenerose arrived at the police station with Cobbs at 12:44 p.m., by which time Cobbs was unresponsive.  *See* Horaz Aff. ¶ 4.  Sergeant Horaz, the desk officer supervising the police station at the time, called for an ambulance, which arrived at the police station at 12:52 p.m., left the station at 1:06 p.m., and arrived at the hospital at 1:08 p.m.  *See* Pl.'s 56.1 ¶ 119; Horaz Aff. ¶¶ 1, 4.  Later that day, at 10:22 p.m. on July 8, 2007, Cobbs was pronounced dead. *See* Pl.'s 56.1 ¶ 120.

The medical examiner who conducted the initial autopsy of Cobbs determined the immediate cause of death to be "Excited Delirium; Acute Mixed Drug Intoxication (Phencyclidine, Cocaine, Lorazepam and Midazolam); Cardiac hypertrophy."[7]  *See* Posner Aff. Ex. K, at 5 (ECF Dkt. No. 62-11) (autopsy report of Dr. Louis S. Roh dated July 9, 2007) ("Medical Examiner Report").  Plaintiff's medical expert also conducted an autopsy, but

---

[7]        "Cardiac hypertrophy is an enlarged heart."  Pl.'s 56.1 ¶ 138.

determined Cobbs's immediate cause of death to be "multi-organ shock with exsanguination"[8] "proximate[ly] cause[d]" by "multiple blunt and electric force injuries (contusions, lacerations; consistent with canine bite marks, and taser burn abrasions)," and related to "multiple, acute drug intoxication; (phencyclidine, cocaine)." *See* Posner Aff. Ex. M, at 16 (ECF Dkt. No. 62-13) (autopsy report of Dr. Lone Thanning dated July 13, 2007) ("Thanning Autopsy Report") (capitalization omitted).  No officer suffered any injury, nor did any officer seek medical attention following Cobbs's arrest.

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

A grant of summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The party moving for summary judgment carries the burden of establishing that no genuine dispute exists.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986); *Atl. Mut. Ins. Co. v. CSX Lines, LLC*, 432 F.3d 428, 433 (2d Cir. 2005).  "'A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)).  In assessing whether summary judgment is proper, the court must construe "the evidence in the light most

---

[8]      "Exsanguination is the medical term for bleeding out."  *Gibbons v. Ercole*, No. 05 Civ. 9413 (PAC) (MHD), 2008 WL 8049268, at *5 n.17 (S.D.N.Y. Sept. 24, 2008), *report and recommendation adopted*, No. 05 Civ. 9413 (PAC) (MHD), 2010 WL 3199869 (S.D.N.Y. Aug. 12, 2010).

favorable to the nonmoving party and draw[] all reasonable inferences in [the non-movant's] favor." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

"When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). To defeat a motion for summary judgment, the non-movant must identify probative evidence on the record from which a reasonable factfinder could find in its favor. *Liberty Lobby*, 477 U.S. at 256–57. That is, the non-movant must make a showing of sufficient evidence of a "claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)). "[T]he nonmoving party [is therefore required] to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, [and] designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

Further, when the court is faced with "a suit for the use of deadly force, in which 'the witness most likely to contradict [the police officer's] story—the [deceased] person . . . —is unable to testify[,] . . . the court may not simply accept what may be a self-serving account by the police officer.'" *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). Rather, the court must "consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'" *Id.* (quoting

*Scott*, 39 F.3d at 915) (citing *Maravilla v. United States*, 60 F.3d 1230, 1233–34 (7th Cir. 1995);

*Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).

## II.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIM

Defendants claim they are entitled to summary judgment on plaintiff's excessive force

claim because their conduct (1) was objectively reasonable under the circumstances and (2) did

not violate clearly-established law.  Defs.' Br. 35–37.  These grounds amount to the affirmative

defense of qualified immunity.

The purpose of qualified immunity is to shield government actors "'from liability for

civil damages if their actions did not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866

(2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The rule is one of fairness "to

protect public officials acting in good faith."  *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d

31, 61 (2d Cir. 2014); *see also Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("The principles

of qualified immunity shield an officer from personal liability when an officer reasonably

believes that his or her conduct complies with the law.").  Thus, "'[t]he salient question . . . is

whether the state of the law' at the time of an incident provided 'fair warning' to the defendants

[police officers] 'that their alleged [conduct] was unconstitutional.'"  *Tolan*, 134 S. Ct. at 1866

(alterations in original) (quoting *Hope*, 536 U.S. at 741).

Accordingly, when a defendant raises the defense of qualified immunity at the summary

judgment stage, courts engage in a two-step inquiry.  "The first [step] asks whether the facts,

'[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's

conduct violated a [federal] right.  When a plaintiff alleges excessive force during an

investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Id.* at 1865 (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Therefore, an excessive force claim "is governed by the Fourth Amendment's 'reasonableness' standard," under which the court must "determin[e] the *objective reasonableness* of a particular seizure" through "a careful balancing of the *nature and quality of the intrusion* on the individual's Fourth Amendment interests," such as the degree of force used, "against the countervailing governmental interests at stake." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (emphases added) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The second step "asks whether the right in question was 'clearly established' at the time of the violation." *Tolan*, 134 S. Ct. at 1866 (quoting *Hope*, 536 U.S. at 739); *see also Jackson v. Humphrey*, 776 F.3d 1232, 1240 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 155 (2015).  Under either step of the analysis, a "court[] may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citations omitted).  Furthermore, the Supreme Court has clarified that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  Here, the court begins its analysis by examining whether the facts, when viewed in the light most favorable to plaintiff, establish that the Officers' use of force against Cobbs was reasonable under the circumstances.

### A. Genuine Factual Disputes Remain as to Whether the Officers' Use of Force Was Objectively Reasonable Under the Circumstances

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d

Cir. 2010) (citing *Graham*, 490 U.S. at 395 ("Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."))). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397). To aid in this inquiry, the so-called *Graham* factors are used to assess reasonableness by paying "careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). In addition, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19–22 (1968)). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The Second Circuit has explained, however, that

> [t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some degree of force*, but it does not give the officer license to use force without limit. The force used by the officer must be *reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened*, against the officer.

*Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (emphases added). "The overall inquiry is case-specific, and although the *Graham* factors guide the Court's inquiry, 'in the end,

[the Court] must still slosh [its] way through the factbound morass of reasonableness.'" *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 290 (S.D.N.Y. 2014) (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 382 (2007)), *aff'd in part, dismissed in part sub nom.*, *Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015).

 Further, the reasonableness of an officer's conduct under the Fourth Amendment may not be measured by state law or police department rules, practices, procedures, or policies. Rather, what is relevant to the court's inquiry is whether a violation of the federal constitution has been established. *See Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule."); *Whren v. United States*, 517 U.S. 806, 815–16 (1996) ("[P]olice enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and from time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable, and can be made to turn upon such trivialities."); *see also United States v. Bernacet*, 724 F.3d 269, 277–78 (2d Cir. 2013) ("[T]he Fourth Amendment does not incorporate state *procedural* criminal law. . . . Under New York law, parole violations are not 'offenses' or 'crimes' for the purpose of determining whether officers are authorized to make a warrantless arrest of a person violating his parole. But this limitation on the power to arrest does not mean that violating parole does not implicate New York substantive law. The legality of Bernacet's arrest at New York law therefore does not end, or even inform, the constitutional inquiry. . . . Bernacet's claim is of a constitutional dimension; it cannot be measured with a state law ruler."); *United States v. Wilson*, 699 F.3d 235, 243 (2d Cir. 2012) ("[T]he Fourth Amendment does not generally incorporate local statutory or regulatory restrictions on seizures and . . . the violation of such restrictions will not generally affect the constitutionality of a seizure

supported by probable cause."); *Barcomb v. Sabo*, 487 F. App'x 645, 647 (2d Cir. 2012) ("Barcomb's reliance on New York law is unavailing in the context of an alleged constitutional tort. A § 1983 claim for false arrest derives from an individual's right to be free of unreasonable seizures under the Fourth Amendment, and state law procedural requirements do not delineate the Fourth Amendment's protections." (citations omitted)).

In sum, for an officer to be "grant[ed] summary judgment against a plaintiff on an excessive force claim . . . no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citing *O'Bert*, 331 F.3d at 37). In other words, for an officer to prevail at the summary judgment stage on a claim of excessive force, the evidence must demonstrate that "no rational jury could have found that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995).

Defendants argue they were faced with a rapidly-evolving situation in which the suspect, Cobbs, was suicidal, had threatened to kill others, was high on PCP and heavily intoxicated, remained violent and erratic, and forcibly resisted arrest. *See* Defs.' Br. 20 ("Cobbs was in the midst of commission of a serious felony, he posed a clear threat to the safety of the officers and he was evading arrest."). Thus, for defendants, even though Cobbs was dead by the end of the night, the use of the K-9 together with the application of the taser to aid in his apprehension and arrest was objectively reasonable under the circumstances, and each officer is therefore entitled to judgment as a matter of law.

For the following reasons, the court holds that, based on the record, it is unable to conclude as a matter of law that the Officers' use of force was objectively reasonable and thus not in violation of Cobbs's Fourth Amendment rights.

### 1.  The Degree of Force

At the outset, the court addresses the degree of force that the use of the K-9 and taser each constitute.  In doing so, it is worth acknowledging the importance of tools like police dogs and tasers.  While they "can potentially inflict serious bodily harm or even death," they "also have great potential to resolve situations without resort to comparatively more lethal force," "frequently enhancing the safety of the officers, bystanders and the suspect."  *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1315–16 (10th Cir. 2009) (quoting *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988)) (internal quotation marks omitted).

### a.  The Use of the K-9 Constituted a Significant Degree of Force

First, it was "clearly established law in the Second Circuit as of April 2000 that it was a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety."  *Garcia*, 43 F. Supp. 3d at 297 (quoting *Abbott v. Sangamon Cty.*, 705 F.3d 706, 724–25 (7th Cir. 2013)).  Although the Second Circuit has not yet stated the level of force that the use of a K-9 police dog constitutes, it has held that the "infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects, and, as such, its use constitutes *a significant degree of force*."  *Tracy*, 623 F.3d at 98 (emphasis added); *see also Garcia*, 43 F. Supp. 3d at 296–97 ("[A]s in *Tracy*, the use of force here was 'significant,' 'somewhere in the middle of the nonlethal-force spectrum' and 'on par with pepper spray.'" (quoting *Abbott*, 705 F.3d at 726)).

Other federal courts of appeals that have addressed the use of a K-9 have held the use of a properly-trained police dog generally does not reach the high degree of force constituting deadly force.  *See, e.g., Thomson*, 584 F.3d at 1315–16; *Miller v. Clark Cty.*, 340 F.3d 959, 963 (9th Cir. 2003) ("Even if it is 'possible' that Kimon could bite a suspect's head or neck, that Kimon is

'capable' of lacerating arteries that could result in a suspect's bleeding to death, and that Kimon injures a suspect more seriously the longer he bites, we still conclude that Deputy Bylsma did not use deadly force when he caused Kimon to bite Miller for up to sixty seconds.  Such mere 'possibilities' and 'capabilities' do not add up to a 'reasonable probability.'  Even when we credit Miller's evidence, as we must at this stage, the risk of death from a police dog bite is remote."); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003).

These courts have found, however, that the use of the bite-and-hold technique by a police dog constitutes a *significant* degree of force.  *See, e.g.*, *Miller*, 340 F.3d at 964 ("The district court found that the force used to seize Miller, though not deadly, was 'considerable' and was 'exacerbated by the duration of the bite.'  Although the police dog was trained to bite and hold a suspect's arm or leg, not to maul a suspect, Deputy Bylsma permitted the dog to bite and hold Miller for an unusually long time period, an action that might cause a suspect pain and bodily injury.  We conclude that the intrusion on Miller's Fourth Amendment interests was a serious one."); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) ("By all accounts, the force used to arrest Chew was severe.  Chew was apprehended by a German Shepherd taught to seize suspects by biting hard and holding.").  Indeed, the dangers involved in deploying a K-9 police dog trained in the bite-and-hold technique have been discussed:

> With the bite-and-hold technique, K-9 dogs are trained to bite and hold the suspect until commanded to release the suspect by the law enforcement K-9 officer.  The suspect often struggles to avoid pain, injury, and arrest, prompting the dog to regrasp and hold with greater bite force.  With this technique, the K-9 dog continues to bite and hold regardless of what the suspect does (surrenders, stands still, or attempts to flee).  *Injury is almost inevitable*.

*Melgar v. Greene*, 593 F.3d 348, 361 (4th Cir. 2010) (Michael, J., dissenting in part and concurring in part) (quoting H. Range Hutson et al., *Law Enforcement K-9 Dog Bites: Injuries, Complications, and Trends*, 29 Annals of Emergency Med. 637, 638 (May 1997)).  Further, such

"dogs tend to be larger breeds, weighing 70 to 90 pounds or more." *Id.* at 362 (citing Peter C. Meade, *Police and Domestic Dog Bite Injuries: What are the Differences? What are the Implications About Police Dog Use?*, 37 Injury Extra 395, 399 (2006), *available at* http://www. sciencedirect.com). Police dogs "are taught to inflict forceful bites using all of their teeth," which can range from "1,200 and 2,000 pounds per square inch," comparable to the amount of force caused by "an automobile wheel running over a body part." *Id.* (citing *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 177 n.3 (4th Cir. 1998); *Miller*, 340 F.3d at 962). As is often the case, the bite-and-hold technique employed by police dogs can cause serious injury, such as disfigurement. *See id.* (collecting cases).

Thus, case law makes clear that, although the use of a police dog properly trained in the bite-and-hold technique does not ordinarily carry a risk of death, there remains a risk that its use can result in serious injury. Further, given the Second Circuit's holding that the use of pepper spray—which, unlike a police dog, carries with it no risk of death or serious or permanent injury such as disfigurement—constitutes a "significant degree of force," the court holds that the use of a police dog constitutes, at a minimum, a significant degree of force.

### b. The Use of the Taser Constituted a Significant Degree of Force

As with the use of police dogs, the Second Circuit has yet to rule on the level of force the use of a taser constitutes. As noted, however, it has found the use of pepper spray "constitutes a significant degree of force." *See Tracy*, 623 F.3d at 98. The usefulness of tasers is indisputable, "mak[ing] people easier to arrest or subdue" by "produc[ing] 50,000 volts of electricity" and "stun[ning] and temporarily disabl[ing] people by causing involuntary muscle contractions," "caus[ing] people to fall." *See* Posner Aff. Ex. U, at 2 (ECF Dkt. No. 62-21) (Nat'l Inst. of Justice, U.S. Department of Justice ("DOJ"), Police Use of Force, Tasers and Other Less-Lethal

20

Weapons (2011)) ("DOJ Taser Report"). A taser may be used in two ways. First, it can "use compressed nitrogen to fire two barbed probes (which are sometimes called darts) at suspects. Electricity travels along thin wires attached to the probes." DOJ Taser Report 2. Second, a taser can be used in "drive stun" mode by which an officer presses the taser directly against a suspect rather than firing darts. *See id.* at 10. As with any method of force, there are of course risks involved in deploying tasers, including death to otherwise "normal, healthy adults," "puncture wounds or burns," or blindness should a dart hit a person's eye. *See id.* at 2. "Despite the dangers, most [taser] shocks produce no serious injuries," and their "use actually decreases the likelihood of suspect injury." *Id.* Indeed, "[a]gencies usually place the [taser] with chemical agents[, such as pepper spray,] in their force continuum, meaning that their use is typically approved in the same circumstances in which pepper spray use is allowed." *Id.* at 5–6.

Nevertheless, this Court has held the use of a taser "is not a 'non-serious or trivial use of force' akin to a shove; rather, it is a 'serious intrusion into the core of the interests protected.'" *Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042 (JPO), 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 810 n.1 (9th Cir. 2010)). Moreover, other federal courts of appeals have found the use of tasers to qualify, at a minimum, as an intermediate level of force. *See, e.g.*, *Bryan*, 630 F.3d at 810 ("Our conclusion that use of the X26 taser and similar devices in dart mode constitutes an intermediate, significant level of force that must be justified by the governmental interest involved, falls well within the national mainstream of the decisions which have examined the nature and quality of the intrusion posed by tasers." (citation omitted) (internal quotation marks omitted)); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) ("Although Tasers may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner. Accordingly, the

'nature and quality' of the intrusion into the interests of Ms. Cavanaugh protected by the Fourth Amendment was quite severe."); *Oliver v. Fiorino*, 586 F.3d 898, 903 (11th Cir. 2009) (recognizing a taser is "designed to cause significant, uncontrollable muscle contractions"); *Orem v. Rephann*, 523 F.3d 442, 447–48 (4th Cir. 2008) (rejecting the argument that a taser constitutes a de minimis level of force); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun . . . to be completely baseless.  The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless.").

While "death and serious harm associated with their use is rare," tasers are designed for the purpose of temporarily paralyzing a suspect by running electricity through his or her body. This is a significant degree of force and therefore a serious "intrusion on the individual's Fourth Amendment interests."  *See Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham*, 490 U.S. at 396). Given that the Second Circuit has found the use of pepper spray constitutes a significant degree of force—which, as noted, carries far lesser risks than the use of a taser—the court holds, at a minimum, the use of a taser also constitutes a significant degree of force.[9]  *See Garcia*, 43 F. Supp. 3d at 297 ("[I]t [is] a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resist[] arrest or pose[] a threat to officer safety, regardless of whether that significant force emanated from a pepper spray canister or the trigger of a taser.").

---

[9]      Indeed, the holding that the application of a taser constitutes, at a minimum, the same degree of force as pepper spray is consistent with the Newburgh Police Department's use of force policy, which lists a taser as "a defensive weapon . . . on the force continuum at the same level as the deployment of [pepper] spray."  *See* Posner Aff. Ex. X, at 1 (ECF Dkt. No. 62-24) (City of Newburgh Police Department General Order No. A-032: "Use of the TASER© electronic incapacitation device").

### 2. *A Reasonable Juror Could Conclude the* **Graham** *Factors Do Not Provide Support for the Officers' Use of Force*

#### a. *The Record Indisputably Establishes that Cobbs Was Arrested for Violent, Criminal Behavior*

The court now turns to the three *Graham* factors (i.e., (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight), beginning with the first. *See Graham*, 490 U.S. at 396. In *Garcia v. Dutchess County*, a case where police officers responded to a 911 call reporting a suspect who was not armed, but was high on cocaine and acting erratically, the responding officers sought to arrest the suspect for what this Court described as "non-criminal" and "nonviolent" behavior. *See Garcia*, 43 F. Supp. 3d at 285, 291. Thus, the *Garcia* Court held, because a reasonable juror could conclude the suspect did not pose any danger to others and was detained for his own safety, "[t]he first *Graham* factor—the nature and severity of the crime leading to the arrest— . . . provide[d] virtually no support for [the officer's] use of the taser against" the suspect. *See id.* at 291.

Here, by contrast, the Officers responded to a situation in which they were informed that the suspect, Cobbs, was intoxicated, having ingested large quantities of PCP, alcohol, and cocaine, and had forced open the door to Wheeler's apartment and entered the premises. *See* Pl.'s 56.1 ¶¶ 2–3, 141, 145. Prior to entering the apartment building, the Officers were also informed that Cobbs had grabbed Wheeler, choked her, and threatened to kill her, himself, and their children, and that he had engaged in a physical altercation with Wheeler's boyfriend. *See* Pl.'s 56.1 ¶¶ 4–5; Wheeler Dep. 26:22–27:14; Wheeler Statement 1–2. The Officers could also hear loud noises emanating from Wheeler's apartment and, as they made their way up to the apartment, they continued to hear the sound of things breaking inside the apartment. *See* Pl.'s

56.1 ¶¶ 33, 49.  Although they had reason to believe Cobbs was violent and posed a danger, however, they had no specific reason to believe he was armed with a weapon.  *See* Pl.'s 56.1 ¶ 35.  Once the Officers arrived at the front door of Wheeler's apartment and attempted to enter, moreover, Cobbs tried to prevent them from entering by charging the door to force it shut before fleeing into another room and out of sight.  *See* Murphy Dep. 24:24–25:13 (Cobbs "came running out of the room and running, like, towards us" and "I wasn't sure if he was going to come tackle us into the hallway, back down the stairs."); Buckley Dep. I, at 18:14–18:17, 20:20–20:25; Ladlee Dep. 12:24–13:17; Vasta Dep. 20:15–21:3, 52:11–52:13.  Officer Vasta then deployed the K-9.

Thus, unlike in *Garcia*, here, the Officers were not seeking to arrest Cobbs for "non-criminal" and "nonviolent" behavior.  Indeed, Wheeler told the Officers she wished to have Cobbs arrested and to press charges against him; she later completed a New York State Domestic Incident Report.  *See* Pl.'s 56.1 ¶ 37–38; Posner Aff. Ex. A (ECF Dkt. No. 62-1) (New York State Domestic Incident Report dated July 8, 2007 and signed by Wheeler).  Based on the evidence on this record, a reasonable juror could conclude that Cobbs, who threatened to kill himself and others, was violent and erratic and posed a danger not only to himself, but to the Officers and others in the apartment building.  As a result, the nature and severity of the crime leading to the arrest of Cobbs offers support for the use of force against him in order to effectuate his arrest.

### b. A Reasonable Juror Could Conclude that Cobbs No Longer Posed a Threat to the Officers When Officer Buckley Deployed the Taser

When considering the *Graham* factors to evaluate the reasonableness of a use of force, courts must also assess "the risk to officer safety."  *Tracy*, 623 F.3d at 98.  Here, the evidence

indisputably establishes that Cobbs initially posed a threat to the Officers' safety. As noted, upon their arrival, the Officers were informed that Cobbs was high on PCP and other intoxicants, had broken into Wheeler's apartment and attacked her, had been involved in a physical altercation with Golding, and had stated he was going to kill Wheeler, their children, and himself. *See* Pl.'s 56.1 ¶¶ 2–8; Wheeler Statement 1–2 ("[Cobb] then grabbed my legs and was holding me. I then tried to get away from him and he then pulled me down to the ground. While he was pulling me to the ground he pulled off my bra. I then fell to the floor. Then he grabbed me and had me in like a head lock and was squeezing hi[s] arm tight around my neck trying to hold me and it was choking me. [Cobbs] then told me that he was going to die and that I was going to go with him. . . . [He] was screaming that he was going to kill my kids."). Wheeler warned the Officers that Cobbs was dangerous and large. *See* Pl.'s 56.1 Statement ¶ 27; Wheeler Dep. 45:23–46:20; Lewis Aff. ¶ 6. Before attempting to enter the apartment, moreover, the Officers could hear the sounds of destruction coming from inside Wheeler's apartment. *See* Pl.'s 56.1 ¶ 33; Murphy Dep. 22:16–22:18; Buckley Dep. I, at 17:8–17:13; Vasta Dep. 22:12–22:15; Ladlee Dep. 8:6–8:13. In short, record evidence makes clear, and no reasonable juror could conclude otherwise, that at the time the K-9 was deployed, the Officers had reason to believe that Cobbs posed an immediate threat to the Officers and others.

The inquiry, however, does not end there. After deploying the K-9, the Officers followed the dog into the apartment and found Cobbs and the K-9 engaged in the living room. *See* Vasta Dep. 25:9–26:22. At this point, given that Cobbs was cornered in the living room of the apartment by several officers, any threat Cobbs previously posed to others, aside from the Officers present at the scene, had dissipated. Cobbs was struggling while being bitten repeatedly and held by the K-9, and four officers were inside the apartment, with two others stationed

downstairs at the entrance to the apartment building and two more outside.  After Cobbs's struggle with the K-9, Officer Buckley fired the taser at Cobbs.  *See* Pl.'s 56.1 ¶ 76.  The record is unclear whether Cobbs was on the ground or on his feet while engaged with the K-9 and when tasered.  *Compare* Buckley Dep. I, at 33:23–34:9("Q. So you're saying that the dog had not actually taken him to the ground?  A. Mr. Cobbs was up and down in a struggle.  There was beer bottles.  There was a mess.  There was total destruction within the living room.  So he's slipping and sliding up and down, struggling with the dog.  He might have gone down to the ground, back up. . . .  He's not in a stationary position, and he wasn't on the ground."), *and* Buckley Dep. II, at 88:6–88:10 (Q. When you tased him, he was still standing?  A. Correct.  Q. Are you saying that he did not go to the ground during the 35 seconds?  A. Not at all, no."), *with* Murphy Dep. 38:6–38:9 ("[A]t one time I turned to Buckley and asked him if [the taser] was working.  I wasn't sure.  The dog was barking.  Cobbs was, like, rolling around."), *and* Vasta Dep. 40:19–40:20 ("He was trying to stand up.  Then he would go onto the ground.  He would spin around.  Flail his arms.").  On summary judgment, the court is required to view the facts in the light most favorable to plaintiff, the non-moving party.  Here, although the evidence is equivocal as to what position Cobbs was in while engaged with the K-9 and being bitten, and the position he was in while being tasered, a reasonable juror could conclude he was on the floor.

The Officers also testified that they believed the taser was not operating properly when it was deployed.  *See* Murphy Dep. 38:20–38:22 ("That's not the normal thing I saw from Cobbs.  He was still rolling around.  That's why I turned to Buckley and asked him if [the taser] was working."); Vasta Dep. 40:21 ("It seemed like [the taser] wasn't even working at that point.").  Defendants argue the application of the taser was justified because Cobbs remained noncompliant while "fighting" with the K-9 and repeatedly punching and kicking the dog in the

26

head and grabbing the snout.  *See* Vasta Dep. 26:17–28:3; Officer Narratives 3 (Officer Buckley writing that "[Cobbs] began to fight violently with K-9 'Chuck' kicking and punching . . . the K-9."); Buckley Dep. I, at 28:7–28:8 ("I recall Mr. Cobbs punching and kicking the dog around his snout area and the center of the body."); Murphy Dep. 32:10–32:11 ("He's kicking it.  He's punching it.  He's grabbing—actually putting his hands by its mouth.").

Officer Vasta, the K-9's handler, testified that the dog received a laceration above one of its eyes as a result of Cobbs violently punching and kicking the dog.  *See* Vasta Dep. 42:4–42:11. Officer Vasta also testified, however, that he was trained to take his K-9 to a veterinarian for treatment of any injuries.  *See* Vasta Dep. 42:21–44:3.  Although Officer Vasta insists Cobbs injured the K-9, and the Officers testified that Cobbs repeatedly kicked and punched the K-9 in the head, there is no physical evidence on the record actually documenting any such injuries to corroborate Officer Vasta's version of the facts.  Indeed, Officer Vasta did not seek medical treatment for the K-9 following the dog's apprehension of Cobbs, which by his own admission violated his K-9-handler training.  *See* Vasta Dep. 42:21–44:3.  Rather, Officer Vasta maintains that he monitored and treated the dog's injuries himself.  *See* Vasta Dep. 43:7–43:13.

Thus, viewing the evidence in the light most favorable to plaintiff as the non-movant, a reasonable juror could conclude that Officer Vasta would not have deliberately chosen to treat the K-9's wounds himself in contravention of his training.  Rather, a juror might reasonably determine that Officer Vasta did not bring the K-9 to the veterinarian for treatment because the dog suffered no injuries at all, as there is no physical evidence on the record documenting this claim.  Relatedly, a reasonable juror might also reach the conclusion that the K-9 was not injured because Cobbs did not repeatedly strike it.  Had Cobbs done so, a juror might reasonably

conclude that there would have been record evidence supporting this claim aside from the Officers' testimony.

Furthermore, although each Officer testified that Cobbs remained violent while engaged with the K-9, there is no evidence that Cobbs lunged at any officer or moved toward any of them. *See Jaquez v. City of New York*, No. 10 Civ. 2881 (KBF), 2015 WL 2165981, at *20 (S.D.N.Y. May 8, 2015). To the contrary, the Officers each testified that Cobbs remained engaged with the K-9, punching and kicking it. *See* Officer Narratives 3; Vasta Dep. 26:17–28:3; Buckley Dep. I, at 28:7–28:8; Murphy Dep. 32:10–32:11. Indeed, as noted, when engaged with a K-9 trained in the bite-and-hold technique, "[t]he suspect often struggles to avoid pain, injury, and arrest, prompting the dog to regrasp and hold with greater bite force. With this technique, the K-9 dog continues to bite and hold regardless of what the suspect does (surrenders, stands still, or attempts to flee). *Injury is almost inevitable*." *Melgar*, 593 F.3d at 361 (Michael, J., dissenting in part and concurring in part) (internal quotation marks omitted). Further, Cobbs was unarmed, and no officer observed Cobbs wielding any weapon or attempting to retrieve one. *See* Murphy Dep. 41:22–41:24; Vasta Dep. 52:11–52:13. Indeed, no officer sustained any injuries during, or sought medical treatment following, Cobbs's arrest. Thus, a reasonable juror could conclude that, following the K-9's apprehension of Cobbs, and during the time he was engaged with the K-9, he no longer "pose[d] an immediate threat to the safety of the officers or others." *See Graham*, 490 U.S. at 396.

### c.  *A Reasonable Juror Could Conclude That When Tasered, Cobbs Was Not Actively Resisting Arrest*

Last, the court turns to the final *Graham* factor, under which it must determine whether Cobbs's conduct amounted to "actively resisting arrest" such as would weigh in favor of a

finding that Officer Vasta's deployment of the K-9 and Officer Buckley's use of the taser were reasonable. *See Tracy*, 623 F.3d at 96. As noted, Cobbs charged at the Officers in the doorway as they attempted to open the front door. *See* Officer Narratives 2–3; Buckley Dep. I, at 18:15–18:17, 20:20–20:25; Ladlee Dep. 12:25–13:17; Murphy Dep. 24:24–25:19, 41:22–41:24; Vasta Dep. 20:15–21:3, 52:11–52:13. Following his failed attempt to prevent the Officers from entering, Cobbs fled to the living room, which was out of the Officers' eyesight, leading Officer Vasta to deploy the K-9. *See* Vasta Dep. 21:4–21:21, 22:6–23:13, 24:9–24:12; Buckley Dep. I, at 20:17–20:19; Ladlee Dep. 13:23–13:25; Murphy Dep. 26:20.

The court's analysis is informed by the Ninth Circuit's holding in *Chew v. Gates*, in which the Court found that a suspect who fled and hid from police after being stopped for a traffic violation was not actively resisting arrest to the point that the deployment of a K-9 police dog was warranted in apprehending him. *See Chew*, 27 F.3d at 1442. The Ninth Circuit noted that the suspect did not engage in any threatening behavior during the hour and a half before the K-9 was released in an effort to capture him. *See id.* Rather, he hid quietly during that time period while police searched for him. *See id.* The *Chew* Court observed the suspect did not "resist arrest to the point of offering any physical resistance to the arresting officers, nor, at the time the officers released the dogs, did they have any particular reason to believe that he would do so." *Id.*

Unlike the suspect in *Chew*, here, the Officers have presented an articulable basis for believing that Cobbs "engaged in . . . threatening behavior" during their effort to capture him and that he might physically resist arrest. *See id.* This is not a situation where the suspect hid quietly and did not "pose[] an[y] immediate threat to the safety of the officers or others." *See id.* at 1441. Nor is it a situation where Cobbs, the suspect, was initially approached for a minor

offense, such as a traffic violation.  Rather, here, unlike in *Chew*, the Officers were confronted

with a rapidly-developing situation with a suspect they were told was high on PCP and other

intoxicants, had threatened to kill himself and others, and remained violent and unpredictable.

Indeed, the Officers were trained to use the K-9, where, as here, there remained uncertainties

regarding a rapidly-developing situation, posing a danger to officer safety.  *See* Posner Aff. Ex.

Y, at 1 (ECF Dkt. No. 62-25) (City of Newburgh Police Department General Order No. O-002:

"Duties of K-9 Teams & Non K-9 Officer Awareness") ("K-9 Policy") ("These procedures are to

ensure the effective use of K-9 Teams in criminal apprehension, tracking/locating missing

persons (criminal or civilian), building searches, area searches, evidence detection, narcotics

detection, crowd control and promoting favorable public relations through K-9 demonstrations.

. . . The K-9 Unit serves as a very important asset which may substantially reduce the danger

inherent to law enforcement officers in the performance of their duties."); Murphy Dep. 21:11–

21:21 ("Normally, you bring a dog up because there's an unknown.  We don't know if he has a

weapon. . . .  A dog would be used to make an apprehension safer for the officers.").  The court

thus finds that record evidence indisputably establishes that Cobbs, at the time of deployment of

the K-9 by Officer Vasta, was actively resisting arrest.

Despite this holding, the court further finds that a reasonable juror could reach a different

conclusion as to the use of the taser and the continued use of the K-9 following the dog's

apprehension of Cobbs.  *See Garcia*, 43 F. Supp. 3d at 295 ("'[T]he fact that an initial use of

force' . . . was 'justified does not mean that all subsequent uses of . . . force were similarly

justified.'  In the course of responding to evolving scenarios, officers may encounter

circumstances that compel them to recalibrate the amount of force deployed." (quoting *Abbott*,

705 F.3d at 729)); *see also Meyers v. Baltimore Cty.*, 713 F.3d 723, 733 (4th Cir. 2013) ("[F]orce

justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). That is, once an arrestee is under control, or no longer resisting, a police officer may no longer continue to use force against him or her. *See, e.g.*, *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) ("It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders."); *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) ("The same principle is applicable to the use of pepper spray as a weapon: the use of such weapons (e.g., pepper sprays; police dogs) may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.").

As noted, the K-9, trained in the bite-and-hold technique, apprehended Cobbs in the living room and bit Cobbs repeatedly. *See* Pl.'s 56.1 ¶¶ 44, 68. The court has found a reasonable juror could conclude, based on the evidence, that while engaged with the K-9, Cobbs did not strike it. Importantly, the court has also found that a reasonable juror could find, at the time the taser was applied by Officer Buckley, Cobbs was on the ground. Further, although defendants maintain that the K-9 was removed from Cobbs prior to the use of the taser, the court finds that a juror could reasonably conclude from the record evidence that this was not the case. That is, although the Officers have testified that the K-9 was no longer engaged with Cobbs at the time of the taser's deployment, there is some evidence from which a reasonable juror could conclude otherwise and find that, when the taser was applied, Cobbs continued to be engaged with the dog on the floor. *See* Officer Narratives 2–3, 5 (Officer Buckley writing that "[Cobbs] continued to fight and resist arrest, not complying with these officers['] commands to lie down,

31

and place his hands behind his back.  After several more commands and the taser, [Cobbs] did

comply, and was able to be handcuffed, at which time the K-9 was given the command to

release, which he did without any further incident to the suspect and the officers."; Officer

Flaherty noting that "[w]hen I got into the apartment Officer Vasta had just taken his K-9 off

[Cobbs] and Officer Buckley had deployed his Tazer"; and Sergeant Murphy writing that

"Officer Buckley then deployed the Tazer and the K-9 was removed and . . . Cobbs was finally

able to be handcuffed").

Next, the court concludes a reasonable juror could find, at the time Officer Buckley used

the taser, Cobbs was no longer resisting arrest. Thus, "the third *Graham* 'factor offer[s] little

support for the use of significant force,'" such as a taser. *See Garcia*, 43 F. Supp. 3d at 293

(quoting *Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013)).  Although

defendants contend that Cobbs remained violent and erratic while engaged with the K-9, the

record is unclear as to whether Cobbs, while engaged with the K-9 and while the taser was

deployed, was on the ground or remained standing.  Further, the record is unclear as to the

manner in which Cobbs allegedly resisted arrest while engaged with the K-9. *See* Buckley Dep.

II, at 87:23–88:12 ("Q. When you say you were not getting compliance, what was happening?

What was Mr. Cobbs doing or not doing that indicated to you that you were not getting

compliance? A. He was still combative.  Still told him to get on the ground.  Not on the ground.

Flailing his arms and legs.  Swinging around violently. . . . Q. You're saying he was moving his

arms?  A. Arms, legs, his entire body."); Vasta Dep. 40:19–40:20 ("He was trying to stand up.

Then he would go onto the ground.  He would spin around.  Flail his arms.").

Moreover, despite the Officers' claims that Cobbs remained dangerous and posed a threat

to them by resisting arrest, Officer Vasta testified that he was able to approach Cobbs prior to the

use of the taser and safely remove the K-9 from Cobbs.  *See* Vasta Dep. 28:19–29:9; *see also* Murphy Dep. 34:10–35:8.  As noted, neither he nor any other officer reported suffering any injuries as a result of the encounter with Cobbs, nor did any officer testify that he observed Cobbs brandishing any kind of weapon.  *See* Murphy Dep. 41:22–41:24; Vasta Dep. 52:11–52:13.  The court, on this motion for summary judgment, is required to construe the record in the light most favorable to plaintiff as the non-movant.  Although there is testimony that Cobbs remained violent and resisted arrest, there is also evidence from which a reasonable juror could reach a different conclusion.  That is, the record before the court could lead a reasonable juror to conclude that Cobbs's conduct was not that of someone resisting arrest, but was a natural reaction to being bitten by a K-9 and tasered repeatedly.  *See Garcia*, 43 F. Supp. 3d at 294 ("In addition, his 'wriggl[ing] around' might have been due to his 'responding to . . . the electrical shock from the taser' or 'being pushed and pulled by the five officers on top of him.'" (alterations in original) (citations omitted)).  Moreover, as noted, when faced with a suit involving "the use of deadly force, in which 'the witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify[,] . . . the court may not simply accept what may be a self-serving account by the police officer.'"  *O'Bert*, 331 F.3d at 37 (quoting *Scott*, 39 F.3d at 915).  Accordingly, a juror could reasonably conclude that Cobbs, at the time he was tasered, was no longer actively resisting arrest.

### 3.  *The Court Cannot Conclude as a Matter of Law that the Officers' Interests Justified the Use of Force*

As noted, "[b]ecause '[t]he Fourth Amendment test of reasonableness is one of objective reasonableness,' the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the

countervailing governmental interests at stake." *Tracy*, 623 F.3d 90, 96 (2d Cir. 2010)

(alterations in original) (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005))

(citing *Amnesty Am.*, 361 F.3d at 123) (internal quotation marks omitted).  Thus, "[i]n addition to

the specific *Graham* factors . . . , [courts] must also consider any other relevant circumstances."

*Garcia*, 43 F. Supp. 3d at 294–95 (citing *Tracy*, 623 F.3d at 98; *Graham*, 490 U.S. at 396); *see*

*also Mattos v. Agarano*, 661 F.3d 433, 445 (9th Cir. 2011) ("[W]e must examine the totality of

the circumstances and consider 'whatever specific factors may be appropriate in a particular

case, whether or not listed in *Graham*.'" (quoting *Bryan*, 630 F.3d at 826)).  Three such

circumstances are relevant here: (1) the Officers' alleged failure to warn Cobbs before (a)

entering the apartment, (b) deploying the K-9, and (c) deploying the taser; (2) the duration for

which and the number of times that Cobbs was tasered, and the amount of time he remained

engaged with the K-9; and (3) whether Cobbs was struck by Officer Vasta.

　　　　With respect to plaintiff's claim that the Officers failed to knock and announce their

presence before forcibly entering the apartment, the court finds plaintiff has failed to create a

genuine factual dispute.  Although the Supreme Court has stated that an officer's failure to

announce his or her presence is "among the factors to be considered in assessing the

reasonableness of a search or seizure," the record indisputably establishes that here, the Officers

did so before entering Wheeler's apartment.  *See Wilson v. Arkansas*, 514 U.S. 926, 934 (1995).

Plaintiff points to the Officers' post-incident narrative reports and maintains that a reasonable

juror could conclude that only one announcement was made before the Officers attempted to

gain entry to the apartment.  *See* Pl.'s Br. 7; *compare* Officer Narratives 2 ("I checked the door

to the apartment and it was locked and I could hear . . . Cobbs in the apartment breaking things, I

34

advised . . . Cobbs that he was under arrest and to open the door.'"), *with* Buckley Dep. I, at 17:10–17:11 ("He made several announcements, and no response to the announcement.").

As an initial matter, plaintiff points to no authority to support the proposition that a single announcement under the circumstances present in this case might amount to a constitutional violation. Moreover, it is clear that, after knocking on the closed apartment door, Sergeant Murphy made multiple verbal announcements directing Cobbs to open the door of the apartment and that he was under arrest. *See* Pl.'s 56.1 ¶¶ 52–53; Officer Narratives 2–3, 5; Vasta Dep. 19:24–19:25. After Cobbs failed to respond to Sergeant Murphy's commands, Sergeant Murphy forced opened the door of the apartment. *See* Officer Narratives 2 ("I [(Sergeant Murphy)] advised . . . Cobbs that he was under arrest and to open the door. . . . Cobbs did not so I forced the door open . . . ."); Vasta Dep. 19:24–19:25 ("That's when Sergeant Murphy, after several more announcements, forced the door."). Although the reported number of announcements and the language used by the Officers differs, the record establishes, at a minimum, that multiple announcements were made by Sergeant Murphy to Cobbs. Any inconsistency among the Officers' accounts on this point is immaterial and insufficient to create a triable factual dispute as to whether announcements were made prior to the Officers' entry into the apartment. *See Jaquez*, 2015 WL 2165981, at *18 ("Pointing out minor inconsistencies in the officers' testimony does not negate that each percipient witness says Mr. Jaquez threatened Det. McNamee with a knife immediately prior to being shot.").

The court now turns to plaintiff's allegations that Officer Vasta failed to warn Cobbs that the K-9 would be deployed and that Officer Buckley failed to warn Cobbs before using the taser. According to plaintiff, there is conflicting evidence that could lead a reasonable juror to conclude no such warnings were made to Cobbs prior to the deployment of either the K-9 or the taser.

Courts have consistently held that a failure to warn before the release of a K-9 or the use of taser can constitute excessive force depending on the circumstances. *See, e.g.*, *Mattos*, 661 F.3d at 451 ("[T]he fact that Aikala gave no warning to Jayzel before tasing her pushes this use of force far beyond the pale.  We have previously concluded that an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." (citations omitted)); *Melgar*, 593 F.3d at 358 ("[F]ailure to give a warning *before releasing* a police dog is objectively unreasonable in an excessive force context." (quoting *Vathekan*, 154 F.3d at 179) (internal quotation marks omitted)); *Johnson*, 576 F.3d at 661; *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007); *Garcia*, 43 F. Supp. 3d at 295.  This is because the "particular facts and circumstances, like those here, can heighten the severity of this intrusion.  For example, when a taser is deployed without warning, a person cannot anticipate or prepare for its effects." *Negron v. City of New York*, 976 F. Supp. 2d 360, 367 (S.D.N.Y. 2013).

Nonetheless, as to the use of the K-9, the evidence makes clear that several warnings were directed at Cobbs that he was under arrest and his noncompliance would result in the release of the K-9.  *See* Officer Narratives 2–3, 5 (Sergeant Murphy reporting that "I did not let . . . Cobbs shut the door fully and . . . Cobbs was advised that [the] K-9 would be deployed to apprehend him and he started to break items in the living room."; Officer Ladlee noting "Cobbs was advised that he was under arrest and if he did not come out a Police K9 would be sent in to apprehend."; Officer Vasta writing "I  . . . made a verbal announcement for [Cobbs] to open the door, and keep his hands in the air, he was under arrest for burglary, or the trained police K-9 would be deployed."); Ladlee Dep. 14:3–14:7 ("[T]here [were] more commands given for [him] to come out, or the police K-9 would be sent in.  It was—I believe Officer Vasta gave the commands and Sergeant Murphy gave the commands.  It was numerous times.  No response.");

Murphy Dep. 27:7–27:14 ("Q. What happened at that point, when Officer Vasta comes up with the K-9?  A. Officer Vasta makes announcements for the dog.  Q. What announcement did he make?  A. It's a—verbatim, I don't remember exactly what he said, but, for general, it's, Come on out.  You're under arrest.  We'll release the K-9.  You're under arrest.  City of Newburgh Police."); Vasta Dep. 21:18–22:5 ("Q. So what happened at that point?  A. I went to the top of the stairs, now with my K-9, and I made several announcements myself for Mr. Cobbs to come out, that he was under arrest, or the police K-9 would be deployed.  Q.  That's what you were saying?  A. Yes.  Q. How many announcements did you make?  A. It's three.  Q. You made three announcements?  A. Yes, sir."); Buckley Dep. I, at 22:17–23:3.

Although the Officers may have used different language in their reports and deposition testimony in reference to the announcements and warnings made to Cobbs regarding the deployment of the K-9 dog, these discrepancies are insufficient to create a triable factual dispute as to whether announcements and warnings were made.  *See Jaquez*, 2015 WL 2165981, at *18. It seems plain that Cobbs was warned before the K-9 was deployed.  Plaintiff, moreover, has pointed to no law, and the court can find none, requiring a specified number of announcements to be made before a police dog is deployed.

As to plaintiff's claim that Officer Buckley did not issue any warnings before deploying the taser, the court finds the record evidence makes clear this is not the case, and no reasonable juror could conclude otherwise.  The evidence establishes that Officer Buckley ordered Cobbs to put his hands behind his back, that he was under arrest, and that if he continued to struggle he would be tasered.  *See* Officer Narratives 2–3 (Officer Ladlee noting that "Officer Buckley announced to . . . Cobbs if he continued to fight Officer Buckley was going to deploy the Tazer."; Officer Buckley writing that "[t]his officer made an announcement for [Cobbs] to place

his hands behind his back, he is under arrest and if he failed to do so, he would be tasered");

Buckley Dep. I, at 33:19–33:22 ("I again advised Mr. Cobbs to get on the ground and place his

hands behind his back, that he was under arrest; that if he didn't do that, I would utilize the

Taser."); Murphy Dep. 33:15–33:16 ("Then Officer Buckley at some point in time says, '[w]e're

going to use the Taser.'"); Flaherty Dep. 19:13–19:16 ("Q. Was the next thing you heard the

Taser going off?  A. I heard Buckley make the announcement, and then he ended up deploying

it."); Murphy Dep. 36:17–36:18 ("Then Buckley makes announcements and then deploys the

Taser."); Ladlee Dep. 19:17–19:20 ("He just stated—the only thing I heard Officer Buckley

saying was for [Cobbs] to come into compliance or he was going to fire the Taser.  He gave the

warnings that he was going to use the Taser.").  There is nothing on the record to suggest no such

warning was issued, and plaintiff's speculation is insufficient to create a triable factual dispute

on this ground.  *See Jaquez*, 2015 WL 2165981, at *18.

An additional circumstance the court must weigh is the duration for which the K-9

remained engaged with Cobbs and the period of time for which, and the number of times, Cobbs

was tasered.  *See Mattos*, 661 F.3d at 445–46; *Garcia*, 43 F. Supp. 3d at 295.  Officer Vasta

testified that Cobbs was engaged with the K-9 for "[l]ess than a minute."  *See* Vasta Dep. 26:21–

26:25.  As noted, Officer Vasta and the other officers maintain the K-9 was removed from Cobbs

prior to the deployment of the taser by Officer Buckley.  Officer Buckley's X26 taser contained a

microchip that recorded each trigger-pull and the duration of each discharge associated with that

trigger-pull.  Pl.'s 56.1 ¶ 89.  Although "[t]he chip in the taser d[id] not record the length of time

a completed electrical circuit [was] being conducted through . . . Cobbs," the taser download data

derived from this microchip documented four taser cycles in less than one minute, and that the

taser was used for a total of thirty-five seconds.  *See* Pl.'s 56.1 ¶¶ 90–91.

Defendants maintain that, although the taser download data indicates the taser was discharged for a total of thirty-five seconds, the period of time for which a completed electrical circuit was conducted through Cobbs's body was far less. *See* Defs.' Br. 10. To support this claim, they offer a report from Andrew Hinz, Director of Technical Programs at TASER International, Inc., in which Mr. Hinz opines that a completed circuit existed for only between five and ten seconds. *See* Posner Aff. Ex. P, at 1 (ECF Dkt. No. 62-16) (report and professional opinions of Andrew Hinz, Director of Technical Programs, Taser International, Inc. dated July 29, 2011) ("Hinz Report"). Plaintiff objects to the report's admissibility, claiming defendants have failed to establish the opinion was based on a reliable methodology in accordance with Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578, 592–93 (1993). *See* Pl.'s Br. 10–11.

The court need not reach the question of the report's admissibility. On summary judgment, the court is required to view the facts in the light most favorable to plaintiff, and there is evidence (i.e., the taser download data) from which a reasonable juror could conclude that Cobbs was tasered for thirty-five seconds. *See* Pl.'s 56.1 ¶ 91; Taser Download Data. Thus, the admissibility of defendants' proffered expert report is of little consequence because there is record evidence from which a juror could reasonably conclude that Cobbs was tasered four times (once for each trigger pull) over the course of a one-minute period of time, during which a completed circuit ran through Cobbs's body for a total of thirty-five seconds. A juror could also reasonably conclude that Cobbs remained engaged with the K-9 for as long as ninety-five seconds if the juror determined the K-9 was not removed from Cobbs until after the application of four taser cycles. *See* Vasta Dep. 26:21–26:25. It is well-settled that an officer may not

continue to use force against a suspect who, although previously resistant, has been subdued. *See, e.g.*, *Meyers*, 713 F.3d at 733; *Johnson*, 576 F.3d at 660; *LaLonde*, 204 F.3d at 961.

Last, another relevant circumstance is plaintiff's allegation that Officer Vasta physically struck Cobbs with his hands. *See* Pl.'s Br 11. Although defendants maintain that no officer used any blunt force against Cobbs and the only force used was the use of the K-9 and taser, based on the record before the court, there is evidence from which a reasonable juror could conclude otherwise. *See* Defs.' 56.1 ¶ 102. "[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official." *Saucier*, 533 U.S. at 216 ("When a plaintiff proffers evidence that the official subdued her with a chokehold even though she complied at all times with his orders, while the official proffers evidence that he used only stern words, a trial must be had."). Here, there is evidence from which a reasonable juror could conclude that Officer Vasta struck Cobbs with his hands

General Order No. A-008 of the Newburgh City Police, which contains the Department's policy for the use of force by an officer, directs that, "[i]n all inciden[t]s whereupon any use of force is exercised, it will be documented within the NARRATIVE portion of the OFFENSE/INCIDENT report filed in connection with the incident," and officers, when directed, are "to complete a 'USE OF FORCE REPORT.'" *See* Posner Aff. Ex. W, at 4–5 (ECF Dkt. No. 62-23) (City of Newburgh Police Department General Order No. A-008: "Use of Force"). Following Cobbs's arrest, only Officer Buckley, who deployed the taser, and Officer Vasta, the K-9 handler, completed reports to document the force used to subdue Cobbs. *See* Posner Aff. Ex. E, at 1 (ECF Dkt. No. 62-5) (City of Newburgh Police Department Response to Resistance

Report dated July 8, 2007 completed by Officer Buckley); Posner Aff. Ex. F (ECF Dkt. No. 62-6) (City of Newburgh Police K-9 Use Report dated July 8, 2007).

Specifically, in response to the "[t]ype of force used," Officer Vasta wrote "Other . . . K-9 and Hands." According to Officer Vasta, he used the term "hands" in the report in reference to using his hands to assist in the cuffing of Cobbs's ankles. *See* Vasta Dep. 48:6–48:16. When asked what the term "hands" means when used in such a report, however, Police Chief Eric Paolilli ("Chief Paolilli"), Chief of the Newburgh Police Department on the date of Cobbs's arrest, testified it can be used to refer to guiding a suspect's hands, feet, or head, or using "physical force with their hands to overcome some kind of force or resistance offered by the subject," such as "striking the subject." *See* Suppl. Dep. of Chief Eric Paolilli 31:14–31:22 (ECF Dkt. No. 62-35) ("Paolilli Dep."); *see also* Murphy Dep. 47:14–47:20 ("Q. If you handcuff a suspect, do you fill out a Response to Resistance Report unless some other force is used? Let's say no force is used other than cuffing a suspect. Is the procedure in that situation that you fill out one of these reports? A. No."). Indeed, no other officer involved in applying either set of cuffs to Cobbs filled out a report to document his involvement in handcuffing Cobbs. Further, although Officer Vasta claims he participated in the ankle cuffing, Officer Ladlee testified that the officers who shackled Cobbs's legs were himself, Officer Flaherty, and Sergeant Murphy. *See* Ladlee Dep. 22:23–23:9. Moreover, there is record evidence that Cobbs died, in part, as a result of "blunt force injuries." *See* Thanning Autopsy Report 6–8.

Thus, viewing the record in the light most favorable to plaintiff, as is required on summary judgment, a reasonable juror could conclude: (1) based on Officer Ladlee's testimony, Officer Vasta did not assist in the cuffing of Cobbs; (2) Cobbs sustained blunt force injuries; (3) the use of the term "hands" in a response to resistance report may be used to refer to an officer

striking a suspect with his hands or using his hands to guide or restrain a suspect; and (4) given that Officer Vasta did not participate in the cuffing—the only instance in which he maintains he had contact with Cobbs—his use of the term "hands" was in reference to physically striking Cobbs with his hands, which may have caused, in part, the blunt-force injuries sustained by Cobbs.  In other words, although the Officers have each testified that Cobbs was not struck by Officer Vasta or any other officer, there is evidence from which a reasonable juror could reach a different conclusion.  *See O'Bert*, 331 F.3d at 37 (When faced with "a suit for the use of deadly force, in which 'the witness most likely to contradict [the police officer's] story—the person shot dead—is unable to testify[,] . . . the court may not simply accept what may be a self-serving account by the police officer.'" (quoting *Scott*, 39 F.3d at 915)).  Accordingly, at trial, a jury must have the opportunity to consider the matter further, as material disputes of fact remain not only as to whether Cobbs was physically struck by Officer Vasta, but as to the point in time during the encounter he was struck, and the number of times he was hit.

   Thus, the court holds as a matter of law, that the initial deployment of the K-9 was a reasonable application of force under the circumstances given that an objectively-reasonable officer would have believed that Cobbs posed an immediate threat to the Officers and others when he fled out of sight following his failed attempt to prevent the Officers from gaining entry to the apartment.  Officer Vasta, in accordance with the Newburgh Police Department's K-9 Policy, deployed the K-9 to apprehend a fleeing suspect in an unsearched area within a building in which the Officers had little visibility.  *See* K-9 Policy.  Because no reasonable juror could reach a different conclusion (i.e., that Officer Vasta's deployment of the K-9 was objectively unreasonable under the circumstances), plaintiff's excessive force claim must be dismissed to the extent that it is predicated upon Officer Vasta's initial deployment of the K-9.  *See Greenfield v.*

*Tomaine*, No. 09 Civ. 8102 (CS) (PED), 2011 WL 2714221, at *4 (S.D.N.Y. May 10, 2011),

*report and recommendation adopted*, No. 09-CV-8102 (CS)(PED), 2011 WL 2714219

(S.D.N.Y. July 12, 2011).

      Despite its holding that the initial deployment of the K-9 was objectively reasonable as a

matter of law, the court is mindful of the compounding effect of using the K-9 and the taser at

the same time.  Because a reasonable juror could conclude that the use of the taser while Cobbs

remained engaged with the K-9 was objectively unreasonable, a juror could reach the same

conclusion regarding the continued use of the police dog.  That is, when viewing the facts in the

light most favorable to plaintiff, a juror could conclude that the K-9 was not removed from

Cobbs prior to the deployment of the taser, and it continued to bite Cobbs until the completion of

the four taser cycles administered to Cobbs.  Accordingly, a reasonable juror could conclude that

the continued use of the K-9, compounded with the application of the taser, was excessive and in

violation of the Fourth Amendment.

      In addition to this compounding effect, a reasonable juror could find the duration for

which the force was used was objectively unreasonable under the circumstances, particularly if

the juror concluded the force continued to be applied to Cobbs after he no longer posed a threat

to the Officers, and that Cobbs was not afforded any time to recover between each use of force.

*See Mattos*, 661 F.3d at 445 ("The second overwhelmingly salient factor here is that Jones tased

Brooks three times over the course of less than one minute. . . .  Three tasings in such rapid

succession provided no time for Brooks to recover from the extreme pain she experienced, gather

herself, and reconsider her refusal to comply."); *see also Garcia*, 43 F. Supp. 3d at 295.  In sum,

a reasonable juror could conclude: (1) the police dog was engaged for ninety seconds and (2) the

application of four cycles of the taser for thirty-five seconds meant that an electrical current was flowing through Cobbs's body for thirty-five seconds in less than one minute of time.

The court is mindful that it is to "evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and to "make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *See Tracy*, 623 F.3d at 96 (internal quotation marks omitted). Nevertheless, "the fact that an initial use of force"—the deployment of the K-9 to apprehend Cobbs—was "justified does not mean that all subsequent uses of . . . force were similarly justified." *See Abbott*, 705 F.3d at 729. Moreover, "[i]n the course of responding to evolving scenarios, officers may encounter circumstances that compel them to recalibrate the amount of force deployed," and less lethal tools, such as police dogs and tasers, have great potential to resolve situations without resort to comparatively more lethal force, "frequently enhancing the safety of the officers, bystanders and the suspect." *See Thomson*, 584 F.3d at 1315–16 (quoting *Robinette*, 854 F.2d at 912) (internal quotation marks omitted); *Garcia*, 43 F. Supp. 3d at 295.

Here, however, important questions of fact remain, including: Cobbs's physical posture (i.e., whether he was on the ground or standing) while engaged with the K-9 and when tasered; what, if any, resistance he presented to the Officers or the K-9 as a result of being apprehended by the police dog and while being tasered;[10] whether he was physically struck by Officer Vasta and, if so, when, and how many times. Accordingly, in viewing the evidence in the light most

---

[10]     Plaintiff maintains that Officer Vasta's use of the taser was also excessive and therefore objectively unreasonable because it was used in drive stun mode rather than in dart mode. Having found that a reasonable juror could conclude the use of the taser was unreasonable, thereby precluding summary judgment, the court need not reach the question of the manner in which the taser was employed, which may be decided instead by a jury.

favorable to plaintiff, a reasonable juror could conclude the *Graham* factors tip heavily against the reasonableness of the force used by the Officers, and therefore the court is unable to conclude, as a matter of law, that the force was reasonable under these circumstances. Therefore, defendants' motion for summary judgment must be denied.

### B.  Violation of a Clearly-Established Right

Having found that a juror could reasonably find Cobbs's Fourth Amendment rights were violated by reason of the Officers' use of force, the court turns to defendants' argument that each officer is nonetheless entitled to summary judgment on plaintiff's excessive force claim under the second step of the qualified immunity analysis.  Under this step, the "analysis asks whether the right in question was 'clearly established' at the time of the violation" because "[g]overnmental actors are shielded from liability for civil damages if their actions did not violate *clearly established statutory or constitutional rights of which a reasonable person would have known*." *Tolan*, 134 S. Ct. at 1866 (emphasis added) (quoting *Hope*, 536 U.S. at 739).  To determine whether a right was clearly established at the time of an officer's conduct, a court must "consider[] three factors: (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Shechter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996) (citations omitted) (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)) (internal quotation marks omitted).  As an affirmative defense, "the burden is on the defendant-official to establish [qualified immunity] on a motion for summary judgment." *Bailey v. Pataki*, 708 F.3d 391, 404 (2d Cir. 2013).

The rationale behind the rule of qualified immunity "is to ensure that the official being sued had '*fair warning*' that his or her actions were unlawful." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (emphasis added) (quoting *Hope*, 536 U.S. at 739–40 & n.10); *see also Jackson*, 776 F.3d at 1241–42 ("The purpose for qualified immunity is to permit officials to act without fear of harassing litigation as long as they can reasonably anticipate before they act whether their conduct will expose them to liability. Indeed, '[i]f objective observers cannot predict—at the time of the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages.'" (alteration in original) (quoting *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)). The Second Circuit has clarified, however, that neither its law nor that of the Supreme Court requires the specific behavior to be unlawful for a right to be clearly established. *See Terebesi*, 764 F.3d at 231. Rather, a law is considered to be "clearly established if decisions from this or other circuits '*clearly foreshadow* a particular ruling on the issue.'" *Id.* (emphasis added) (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)) (internal quotation marks omitted); *see also Garcia*, 43 F. Supp. 3d at 296 ("Even if the Second Circuit has not precisely determined the contours of a right, that right may be clearly established such that a defendant is 'stripped . . . of his immunity' as long as 'decisions . . . from courts in other circuits' 'clearly foreshadow a particular ruling on the issue.'" (quoting *Bailey*, 708 F.3d at 405; *Scott*, 616 F.3d at 105)).

"Though '[i]mmunity ordinarily should be decided by the court,' that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) (alteration in original) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). "[A]s with any

issue of nominally disputed fact," however, "if the state of the evidence is such that reasonable jurors could reach only one conclusion, then that factual issue is appropriate for decision by the court as a matter of law." *Id.*

Thus, the question here is whether, when viewing the facts in the light most favorable to plaintiff, it was established or clearly foreshadowed by the Supreme Court or federal courts of appeals by July 8, 2007, that, in effectuating a lawful arrest, an officer's use of force is excessive if he or she uses a taser on an individual who no longer poses an immediate threat, is engaged with a police K-9, and is physically struck by an officer. The court finds that it was.

In *Tracy*, the Second Circuit reversed the district court's grant of qualified immunity for an officer's deployment of pepper spray "mere inches away from the face of a" suspect who was "already in handcuffs and offering no further active resistance." *See Tracy*, 623 F.3d at 98. The Court found a reasonable juror could conclude this constituted an unreasonable use of force under the circumstances, and thus that the officer was not entitled to summary judgment on the claim. *See id.* As noted, the *Tracy* Court concluded that the "infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects, and, as such, its use constitutes a *significant degree of force*." *Id.* (emphasis added) (citing *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) ("The effects of [pepper] spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth.")). Further, the Court observed, given the risks involved with the use of pepper spray, "it should not be used lightly or gratuitously against an arrestee

who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *See id.*

Recently, this Court denied an officer qualified immunity for his use of a taser, likening the application of a taser, at a minimum, to the level of force of pepper spray, which the Court had already held to constitute a significant degree of force. *See Garcia*, 43 F. Supp. 3d at 296–97. The *Garcia* Court reasoned that it was "clearly established law in the Second Circuit as of April 2000 that it was a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to officer safety, regardless of whether that significant force emanated from a pepper spray canister or the trigger of a taser." *Id.* at 297 (citing *Tracy*, 623 F.3d at 98; *Bailey*, 708 F.3d at 405; *Terebesi*, 764 F.3d at 237 n.20).

Furthermore, as the *Garcia* Court observed, it was clearly established by other federal courts of appeals as of March 2010 that the use of a taser against an unarmed and subdued suspect who no longer posed a threat to officers or others was unlawful and violated a suspect's constitutional rights. *See id.* Indeed, the cases upon which *Garcia* relied found the law was clearly established before the date of Cobbs's arrest (i.e., prior to July 2007). *See Meyers*, 713 F.3d at 734–35 (stating the law was clearly established as early as 2003 that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." (quoting *Bailey v. Kennedy*, 349 F.3d 731, 744–45 (4th Cir. 2003))); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (holding that, "[a]t the time Zarrett deployed his Taser and arrested Sandra [(i.e., October 2005)], the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only

noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator"); *Casey*, 509 F.3d at 1281–85 (holding it was clearly established by August 2003 "that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest"); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *see also Cavanaugh*, 625 F.3d at 665–67 (holding it was clearly established by December 2006 that it was unlawful to taser a non-resistant suspect). As relevant here, other federal courts of appeals had clarified, by at least March 2010, that a previously-resisting suspect has a constitutional right to be free from gratuitous tasering once he or she has ceased resisting arrest. *See, e.g.*, *Goodwin v. City of Painesville*, 781 F.3d 314, 327–28 (6th Cir. 2015) (relying on the 2008 case *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008)); *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 897 (8th Cir. 2014) (relying on the 2009 case *Brown*, 574 F.3d at 499–500); *Oliver*, 586 F.3d at 901, 908 (holding it was clearly established by May 2004 that it was excessive force to taser a suspect at least eight times over a two-minute period after the suspect had stopped resisting).

In addition, the degree of force used by the Officers on Cobbs could be found to have exceeded that used in *Garcia*. Viewing the facts in the light most favorable to plaintiff, a reasonable juror could conclude that a taser was used on Cobbs after he was already subdued and on the ground, engaged with and being grasped by the K-9, and being physically struck by Officer Vasta, and therefore no longer posed a threat to the Officers or others. Indeed, the court has already found the use of a K-9 constitutes, at a minimum, a significant degree of force, which is consistent with the findings of other federal courts of appeals. *See, e.g.*, *Matthews v. Jones*, 35 F.3d 1046, 1050 (6th Cir. 1994); *Chew*, 27 F.3d at 1441; *Robinette*, 854 F.2d at 912. Similarly, like any use of force, the federal courts of appeals have found that a suspect who is neither resisting arrest nor attempting to flee has a constitutional right to be free from being bitten by a

K-9.  *See, e.g.*, *Drew v. Milka*, 555 F. App'x 574 (6th Cir. 2014) (holding it was clearly established by July 2002 "that ordering a dog bite on a compliant arrestee violates a clearly established constitutional right"); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) ("We agree that it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation.").

Thus, viewing the evidence in the light most favorable to plaintiff, the court finds a reasonable juror could conclude the force used by the Officers was objectively unreasonable and in violation of the Fourth Amendment.  Although Cobbs initially displayed resistance to arrest and fled into the living room, thereby resulting in the lawful deployment of the K-9, material factual disputes remain following the K-9's deployment, including whether the taser was deployed before the K-9 was removed from Cobbs; the duration for which Cobbs was tasered; whether Cobbs was physically struck by Officer Vasta and, if so, when, and how many times; and whether Cobbs continued to resist arrest, and if so, in what manner.  *See Smith v. Potanovic*, No. 02 Civ. 6240 KMW, 2007 WL 1032270, at *2 (S.D.N.Y. Mar. 27, 2007) ("Summary judgment should be denied with respect to any claim (including any claim for punitive damages) that Defendant failed to recall the dog until an inordinate period of time had elapsed, because there is a genuine issue of material fact about whether Defendant's actions constituted the use of excessive force in violation of a clearly established right.").  As a result, for the same reasons that the Officers are not entitled to summary judgment on the merits of the excessive force claim, they are not entitled to summary judgment on the basis of qualified immunity.  *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain.").

### C.  Failure to Intervene

In addition to the excessive force claim, plaintiff alleges that "each of the individual defendant[ Officers] . . . failed to intervene to prevent the use of excessive force by their fellow officers."  *See* Pl.'s Br. 29; Compl. ¶ 24.  Defendants maintain, however, that irrespective of the court's holdings regarding plaintiff's excessive force claim, Officers "Flaherty and Ladlee are entitled to summary judgment with respect to both plaintiff's excessive force and failure to intervene claims[, because] neither applied force nor w[as] in a position to stop it from being applied."  Defs.' Br. 32.  In other words, according to defendants, neither Officer Flaherty nor Officer Ladlee were personally involved in Cobbs's arrest, and summary judgment is therefore appropriate in favor of these officers.  Plaintiff, however, insists that Officers Flaherty and Ladlee's "reports reflect that they were in the apartment with Cobbs and were directly involved in his arrest," and thus a question of fact exists as to their personal involvement, which precludes summary judgment.  *See* Pl.'s Br. 22.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).  Thus, the Second Circuit has found that

> [a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official.

*Id.* (citations omitted).  "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring."  *Id.*  Indeed, the question of "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm

being caused by another officer is an issue of fact for the jury unless, considering all the

evidence, a reasonable jury could not possibly conclude otherwise." *Id.*

Further, "[a] police officer cannot be held liable in damages for failure to intercede unless

such failure permitted fellow officers to violate a suspect's 'clearly established statutory or

constitutional rights' of which a reasonable person would have known." *Ricciuti v. N.Y.C.*

*Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). Importantly, "[f]ailure to intervene claims are 'contingent upon the disposition of

the primary claims underlying the failure to intervene claim.'" *Usavage v. Port Auth. of N.Y. &*

*N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (quoting *Matthews v. City of New York*, 889 F.

Supp. 2d 418, 443–44 (E.D.N.Y. 2012)).

### 1. *Officer Flaherty*

As to Officer Flaherty, the record is clear that he was not personally involved in the

excessive force allegations in this case. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)

("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to

an award of damages under § 1983." (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)

(internal quotation marks omitted)). When Officer Flaherty arrived on the scene, Sergeant

Murphy and the other officers were already speaking with Wheeler outside of the apartment

building. *See* Flaherty Dep. 15:6–15:19. Officer Flaherty's police report states he did not enter

Wheeler's apartment until after the K-9 had been removed from Cobbs and the taser had been

deployed. *See* Officer Narratives 3 ("When I got into the apartment Officer Vasta had just taken

his K-9 off [Cobbs] and Officer Buckley had deployed his Tazer.").

Further, Officer Flaherty's deposition testimony is consistent with the narrative outlined

in his police report: that he was stationed at the apartment building's front door for security

purposes with Officer Lewis, and that he did not go upstairs to the second floor of the apartment

building until after he heard Officer Vasta recall the K-9 and heard the deployment of the taser.

*See* Flaherty Dep. 19:15–19:16, 23:16–23:20.  This is also consistent with the other Officers'

accounts, which place only Sergeant Murphy and Officers Vasta, Buckley, and Ladlee inside the

apartment prior to Cobbs's arrest.  *See* Murphy Dep. 20:11–20:13; Vasta Dep. 18:4–18:6.  From

where Officer Flaherty was stationed downstairs, he was unable to observe what was happening

inside the apartment.  *See* Flaherty Dep. 33:3–33:11.  The extent of Officer Flaherty's personal

involvement includes assisting Sergeant Murphy place Cobbs's in handcuffs and assisting the

other Officers carry Cobbs downstairs.  *See* Officer Narratives 3 (Officer Flaherty writing that "I

then assisted [Sergeant] Murphy on putting the handcuffs on [Cobbs].");  Flaherty Dep. 28:23–

28:24, 29:2–29:3 ("We just ended up picking him up and bringing him downstairs.").  Plaintiff

does not allege that excessive force was used during the cuffing or while Cobbs was being

carried down the stairs.

      Plaintiff has therefore presented no evidence from which a jury could reasonably

conclude that Officer Flaherty was in a position to prevent any harm from occurring since he was

not present in the apartment until after the K-9 and taser were used.  *See Chamberlain v. City of*

*White Plains*, 986 F. Supp. 2d 363, 387 (S.D.N.Y. Dec. 10, 2013) (concluding a plaintiff did "not

plausibly allege that any other officer had a 'realistic opportunity' to prevent either of those uses

of force" (quoting *Anderson*, 17 F.3d at 557)); *Cerbelli v. City of New York*, No. 99-CV-6846

(ARR) (RML), 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) (granting summary judgment

to officers on plaintiff's failure to intervene claim because the officers "could not reasonably

have interjected themselves into the situation during this window to prevent further

unconstitutional firings").  Further, there is no evidence to suggest that Officer Flaherty would

have known, or had reason to believe, that Cobbs's constitutional rights were being violated because Officer Flaherty was unable to personally observe Cobbs or the situation unfolding inside the apartment because he was stationed downstairs at the front entrance to the building. *See, e.g.*, *Smith v. P.O. Canine Dog Chas*, No. 02 6240 KMW DF, 2004 WL 2202564, at *10 (S.D.N.Y. Sept. 28, 2004) (granting summary judgment on claims of excessive force and failure to intercede because there was no "indication that any of the named defendants would have known, or had reason to believe, that the alleged violation of constitutional rights was occurring"). Accordingly, any claims of excessive force or failure to intervene against Officer Flaherty are dismissed.

### 2. *Officer Ladlee*

With regard to Officer Ladlee, however, the record is less clear as to whether he was in a position to intervene to prevent the allegedly excessive force used against Cobbs by the other Officers. The only account as to the movements of Officer Ladlee is his own deposition testimony. According to Officer Ladlee, he was standing directly behind Officer Vasta when the K-9 was deployed at the entrance of the apartment and he observed Cobbs run to the left and out of sight. *See* Ladlee Dep. 13:23–13:25. Officer Ladlee testified that, following the deployment of the K-9, he immediately entered the apartment, but rather than take a position in the living room, he screened the apartment to ensure there was no one else present. *See* Ladlee Dep. 14:22–16:6. He claims he did not enter the living room where Cobbs was located because it was overcrowded, and that he instead stood at the front door to the apartment after completing his search of the premises. *See* Ladlee Dep. 15:22–16:6. Further, according to Officer Ladlee, when he next saw Cobbs he was "flailing his arms and kicking." *See* Ladlee Dep. 20:4–20:7. Once he

was able to see into the living room, however, he could not recall whether the taser had yet been fired. *See* Ladlee Dep. 20:15–20:21.

Having found a reasonable juror could conclude the use of the taser and continued use of the K-9 were in violation of Cobbs's Fourth Amendment rights, and viewing the evidence in the light most favorable to plaintiff (i.e., that the taser had not yet been deployed when Office Ladlee entered the living room), a reasonable juror could also conclude that Officer Ladlee was in a position to intervene and thereby prevent the alleged constitutional violation (i.e., the deployment of the taser). *See Fischl v. Armitage*, 128 F.3d 50, 57 (2d Cir. 1997) ("Assuming the accuracy of Fischl's estimates that the attack occurred between 9:00 and 9:30 and lasted some 10 minutes, the record suggests that Marshall either was in the control area at the time Fischl's cell door was opened to let the inmates in, or was in the corridor while the attack was going on. The record would thus permit a reasonable juror to find either that Marshall opened the cell door for the inmates himself, or that he was in the vicinity of the ongoing attack and, despite Fischl's shouts, knowingly did nothing to stop it. Either would suffice to show Marshall's personal involvement."). Qualified immunity does not alter this analysis. As explained, the law was clearly established that, under these facts, a juror could reasonably determine it would have been objectively unreasonable for Officer Ladlee to believe the use of the taser, coupled with the continued use of the K-9, was not a violation of Cobbs's constitutional rights. Accordingly, Officer Ladlee is not entitled to summary judgment for the failure to intervene claims.

### 3.   *Sergeant Murphy, Officer Vasta, and Officer Buckley*

For the same reasons, Sergeant Murphy and Officers Vasta and Buckley are not entitled to summary judgment for any claims against them for failing to intercede. The record indisputably establishes that each of these officers was present in the living room throughout the

K-9's engagement with Cobbs and during Officer Buckley's deployment of the taser; defendants do not claim otherwise.  Thus, a juror could reasonably conclude that Sergeant Murphy and Officers Vasta and Buckley were each in a position to intervene to prevent the use of the allegedly excessive force against Cobbs.

### 4. *Officer Jenerose*

Last, although plaintiff named Officer Jenerose as a defendant in this action, she does not appear to have brought any claims against him.  Indeed, in her memorandum in opposition to defendants' motion for summary judgment, plaintiff makes no allegations against Officer Jenerose, nor has she alleged any set of facts from which a reasonable juror could conclude that Officer Jenerose was involved in any of the injuries suffered by Cobbs, or in a position to prevent them.  Accordingly, because plaintiff failed to brief any claims against Officer Jenerose, any claims against him have been waived and abandoned.  *See Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006).

Furthermore, to the extent plaintiff suggests Officer Jenerose either used force against Cobbs or was in a position to prevent it, the court finds no reasonable juror could reach this conclusion.  *See* Pl.'s 56.1 ¶ 48.  The only evidence regarding Officer Jenerose's involvement in Cobbs's arrest is his affidavit in which he states he "was assigned the rear yard to cover any attempt at flight and provide perimeter security" with Officer Romero.  Jenerose Aff. ¶ 2.  Thus, according to Officer Jenerose, he "was not involved in Mr. Cobbs'[s] arrest nor present inside the apartment."  *See* Jenerose Aff. ¶ 2.  Plaintiff maintains a reasonable juror could conclude that Officer Jenerose was in the apartment at the time the K-9 was deployed and the taser was fired based on Wheeler's testimony when asked how many officers she saw enter the apartment: "I don't know, like six, seven, eight.  I don't know."  *See* Wheeler Dep. 50:24–51:5.  This on its

own, however, is insufficient to create a triable factual dispute as to whether Officer Jenerose

was present inside the apartment.  Wheeler says nothing to suggest that Officer Jenerose entered

the apartment building or that he went upstairs to her unit.  Indeed, when asked how many

officers she observed enter the apartment building, her testimony makes clear that she did not

know.  Nor does any other officer place Officer Jenerose inside the apartment during Cobbs's

arrest.  Thus, there is no evidence that contradicts Officer Jenerose's account that he remained

outside of the apartment building during Cobbs's arrest.

Moreover, the extent of Officer Jenerose's involvement following Cobbs's arrest was that

Cobbs was placed in Officer Jenerose's patrol car and he drove Cobbs to the police station.  *See*

Jenerose Aff. ¶¶ 4, 5.  Plaintiff has made no claims that Officer Jenerose or any other individual

defendant used unreasonable force against Cobbs following his arrest, nor has plaintiff brought a

claim against any individual defendant for failure to provide medical care.  Thus, because Officer

Jenerose was not personally involved in Cobbs's arrest and was not in a position to intervene to

prevent any of the alleged constitutional violations, the court finds, as a matter of law, he may

not be held liable for a failure to intervene.  Accordingly, Officer Jenerose is dismissed as a

defendant in this action.

## III.   *MONELL* LIABILITY

In addition to the claims brought against the individual Officers under 42 U.S.C. § 1983,

plaintiff also asserts claims against the City of Newburgh for municipal liability under *Monell*.

*See Monell*, 436 U.S. at 694.  Plaintiff alleges multiple theories of municipal liability against the

City, including: (1) the police department did not train officers in dealing with a suspect high on

narcotics; (2) the police department condoned officers not seeking immediate medical attention

for injured arrestees; (3) the police department condoned officers writing reports that lacked

significant details; (4) the police department condoned officers releasing K-9 dogs on suspects high on PCP; and (5) the police department has settled numerous excessive force lawsuits under Police Chief Paolilli's command without taking action against the offending officers.  *See* Compl. ¶¶ 32, 33; Pl.'s Br. 18–19.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694; *City of Canton v. Harris*, 489 U.S. 378 (1989)).  In other words, under 42 U.S.C. § 1983, "a municipality cannot be held liable *solely* because it employs a tortfeasor."  *Monell*, 436 U.S. at 691 ("[T]he language of § 1983, read against the background of [its] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.  In particular, we conclude that a municipality . . . cannot be held liable under § 1983 on a *respondeat superior* theory.").

Thus, "to hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)) (internal quotation marks omitted).  Put differently, to establish municipal liability or a valid *Monell* claim under § 1983, a plaintiff must demonstrate "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *See Harris*, 489 U.S. at 385.

### A.  Failure to Train

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to '*deliberate indifference*' to the rights of those with whom the city employees interact."  *Wray*, 490 F.3d at 195 (emphasis added) (quoting *Harris*, 489 U.S. at 388).

> To establish "deliberate indifference," a plaintiff must show that: [1] a policymaker knows "to a moral certainty" that city employees will confront a particular situation; [2] the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and [3] "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."

*Id.* at 195–96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Deliberate indifference is not established where a policymaker "fail[s] to train employees for rare or unforeseen events."  *Id.* at 196 (quoting *Walker*, 974 F.2d at 297) (internal quotation marks omitted).  Further, where, as here, "a city has a training program, a plaintiff must—in addition— 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Id.* (quoting *Amnesty Am.*, 361 F.3d at 129; *Harris*, 489 U.S. at 391).  Moreover, "[w]hile an isolated act of excessive force by a single, non-policymaking municipal employee, standing alone, is insufficient evidence, a policy or custom may be inferred from acts or omissions of a municipality's supervisory officials serious enough to amount to gross negligence or deliberate indifference to the constitutional rights of the plaintiff."  *Villante v. Dep't of Corr. of City of N.Y.*, 786 F.2d 516, 519 (2d Cir. 1986) (citations omitted).

Plaintiff claims the City failed to train its officers not to use excessive force in making arrests of individuals suspected of being high on narcotics.  *See* Pl.'s Suppl. Mem. of Law in

Opp'n to Mot. for Summ. J. and J. on the Pleadings 6–7 (ECF Dkt. No. 84) ("Pl.'s Suppl. Br.").

Plaintiff claims the City did not have in place a specific policy regarding the arrest of individuals

suspected of being high on narcotics, and the absence of such a policy resulted in the improper

use of force against Cobbs and the violation of his constitutional rights.  *See* Pl.'s Suppl. Br. 7–8

("[A]side from not having a written policy, both [Officer] Vasta and [Sergeant] Murphy testified

to a lack of training and guidance regarding apprehension or arrest of persons suspected of being

high on narcotics.").  That is, plaintiff contends she has proffered sufficient evidence for a

reasonable factfinder to conclude that the City's failure to train rose to the level of deliberate

indifference.  *See* Pl.'s Suppl. Br. 7.  To support this claim, plaintiff relies on the following

passage from a report prepared by her police practices expert, Ernest Burwell, a police consultant

and former Deputy Sheriff with the Los Angeles County Sheriff's Department:

> Using the police dog in this incident was excessive and unnecessary force.  A
> police service canine utilized to bite a person is a use of force by pain compliance.
> It is against the industry standard that using a police dog to bite a person known to
> be on PCP, that person will not feel the pain at the time of the bite.
> [Nevertheless], the injury sustained from the bite is the same.  Using the dog in
> this manner makes the apprehension less safe for the officers, the dog, and the
> suspect.  Other options and tactics were available.

*See* Posner Aff. Ex. Q, at 8 (ECF Dkt. No. 62-17) (report of Ernest Burwell dated July 5, 2011)

("Burwell Report").

As an initial matter, an expert's ipse dixit statement regarding a purported inadequacy in

a municipality's training program, i.e., that it is against the industry standard, and that this

somehow constitutes a constitutional violation, is insufficient to withstand summary judgment.

To support a claim for failure to train, a plaintiff must "establish not only that the officials'

purported failure to train occurred under circumstances that could constitute deliberate

indifference, but also . . . identify a specific deficiency in the city's training program and

establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation."  *See Amnesty Am.*, 361 F.3d at 130 (quoting *Harris*, 489 U.S. at 391).  The Supreme Court, moreover, has "emphasized . . . that plaintiffs must establish that 'the officer's shortcomings . . . resulted from . . . a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances.  *Id.* (quoting *Harris*, 489 U.S. at 390–91).  Furthermore, although plaintiff's expert claims the use of the K-9 in this instance was "excessive and unnecessary," and that the use of a K-9 on a suspect "known to be on PCP" was "against the industry standard," he says nothing about the City's K-9 policy being deficient in any respect.  *See* Burwell Report 8.  That is, his conclusions do not reference any deficiency in a City policy or that a specific policy for confronting individuals suspected of being high on narcotics is constitutionally required.  Rather, Mr. Burwell states that it was the conduct of the Officers themselves that was unlawful.

"It is impossible to prevail on a claim that the [City's] training program was inadequate without any evidence as to . . . how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances,'" in this case dealing with an individual suspected of being high on narcotics.  *See Amnesty Am.*, 361 F.3d at 130 (quoting *Harris*, 489 U.S. at 391).  Further, plaintiff has "provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training, and therefore no reasonable factfinder could conclude that the excessive force occurred as a result of training deficiencies."  *See id.* (citing *Harris*, 489 U.S. at 390–91).  Because plaintiff has produced no evidence that the

Officers "were improperly trained and that this training caused them to use excessive force," the City is entitled to summary judgment on this theory of municipal liability.

### B.  Policy, Practice, or Custom

"A municipality may be found to have a custom that causes a constitutional violation" if the city has been "faced with a pattern of misconduct," but "does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009) (citations omitted) (internal quotation marks omitted) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).  The Supreme Court has clarified, however, that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  *City of Oklahoma City v. Tuttle*, 105 S. Ct. 2427, 2445 (1985).  Ultimately, the burden is on the plaintiff to "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Board of Cty. Comm'r of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).

Plaintiff argues three separate theories upon which she claims the City has established an unconstitutional policy, practice, or custom, which resulted in the violation of Cobbs's constitutional rights.  The court addresses each of these in turn.

### 1.  The Newburgh Police Department's Prisoner Medical Treatment Policy

Plaintiff asserts a theory of municipal liability against the City on the basis that Chief Paolilli, Chief of the Newburgh Police Department on the date of Cobbs's arrest, maintained that

the Officers acted properly by taking Cobbs to the police station following his arrest, rather than

directly to the hospital.  *See* Pl.'s Br. 20; Aff. of Chief Eric Paolilli ¶ 3 (ECF Dkt. No. 64)

("Paolilli Aff.") ("Sergeant Murphy made an appropriate decision as supervisor to direct Officer

Jenerose to take Mr. Cobbs to the station rather than to the hospital.").  Plaintiff maintains Chief

Paolilli, who as police chief "had final policymaking authority for the department," acquiesced,

authorized, or condoned the Officers' actions, which plaintiff believes violated the Newburgh

Police Department's policy for providing medical treatment to prisoners.  *See* Pl.'s Br. 20.  In

particular, plaintiff argues the City violated Cobbs's constitutional rights because the Officers

did not adhere to the Newburgh Police Department's policy for providing medical treatment to

prisoners, as outlined in General Order No. O-020, which provides, in relevant part:

> If, at the time of arrest, a prisoner is in need of medical treatment because of an
> Injury or illness, he will immediately be transported to St. Luke's [Emergency
> Room] for treatment.  He will be handcuffed and treated as a prisoner at all times.
> The arresting officer will insure that the bottom slip of the chart is retained upon
> release of the prisoner for the Police Department's records.

Posner Aff. Ex. AA, 11 (ECF Dkt. No. 62-27) (City of Newburgh Police Department General

Order No. O-020: "Transporting, Processing and Detention of Prisoners") ("Prisoner Policy").

    Plaintiff's claim must fail because she makes no claim that the Police Department's

Prisoner Policy is itself unconstitutional, and the burden was on plaintiff to provide evidence of a

pattern of acquiescence in the alleged unconstitutional conduct so as to rise to the level of "a

pattern of misconduct."  *See Okin*, 577 F.3d at 439 (quoting *Reynolds*, 506 F.3d at 192).  Aside

from pointing to the alleged constitutional deprivation, plaintiff has offered no evidence to

establish a nexus between the alleged constitutional violation and the City itself (i.e., that the

City encouraged or endorsed a practice that caused the alleged violation of Cobbs's rights).  *See*

*Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980) ("[A]bsent more evidence of supervisory

indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause or with excessive use of force."); *Okin*, 577 F.3d at 439–40.  Accordingly, this claim is dismissed.

### 2.   *The Newburgh Police Department's Report Writing Policy*

Plaintiff also argues that the Newburgh Police Department has a custom, policy, or practice "in which [the] use of force [is] not adequately reported to afford meaningful administrative review," thereby encouraging the use of excessive force by its officers.  *See* Pl.'s Suppl. Br. 4–5.  To support this claim, plaintiff points to Chief Paolilli's testimony that the Officers' reports related to Cobbs's arrest "'properly document[ed] the incident.'"  *See* Pl.'s Suppl. Br. 5 (quoting Paolilli Aff. ¶ 19).  According to plaintiff, a reasonable juror could conclude that Chief Paolilli's testimony establishes a policy of deliberate indifference by the City, characterized by the Newburgh Police Department's disregard of its own written policy for documenting the use of force, resulting in the condonation and regular disregard of constitutional violations by its officers.  *See* Pl.'s Suppl. Br. 5.

The court finds that plaintiff's argument must fail as a matter of law, largely for the same reasons that plaintiff's argument related to the City's Prisoner Policy was found to be inadequate.  Specifically, plaintiff has failed to create a material factual dispute as to the inadequacy of the Officers' reports in this case.  Aside from plaintiff's bare assertion that the reports were wanting (i.e., "lacking in meaningful detail"), plaintiff has pointed to no evidence that this is, in fact, the case.  *See* Pl.'s Br. 19.  Further, even if plaintiff established that these reports were somehow constitutionally inadequate, she has failed to demonstrate an ongoing pattern of such unconstitutional conduct by the City and its officers.  Put differently, aside from the present case, plaintiff has pointed to no evidence of prior conduct on the part of Chief Paolilli and the

Newburgh Police Department's officers.  *See Tuttle*, 471 U.S. at 824 ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." (footnotes omitted)).  Accordingly, this claim is dismissed.

### 3.   *The Newburgh Police Department's K-9 Policy*

Next, plaintiff asserts that Chief Paolilli "condoned the [O]fficers' use of the police canine on Cobbs," which "is reflective of departmental custom or policy to allow for use of canines to 'apprehend' subjects high on PCP."  *See* Pl.'s Br. 21–22.  To plaintiff, Chief Paolilli's statement "reflects deliberate indifference by a final policymaker . . . to unreasonable use of the police K-9, i.e., permitting the dog to continue to bite the suspect while he is being tased and handcuffed."  Pl.'s Suppl. Br. 6.  Further, according to plaintiff, the use of a K-9 on a subject high on PCP "is against industry standards and protocol and amounts to an excessive and unreasonable use of force."  *See* Pl.'s Br. 22.  To support this claim, plaintiff again points to the Burwell Report, which states, without support: "[i]t is against the industry standard [to use] a police dog to bite a person known to be on PCP," and thus the use of "the police dog in this incident was excessive and unnecessary force."  *See* Burwell Report 8.

Plaintiff has failed to create a material factual dispute as to whether the Newburgh Police Department's K-9 Policy is itself unconstitutional, or whether the use of a K-9 to apprehend a suspect under the influence of narcotics amounts to unreasonable and excessive force.  Mr. Burwell's ipse dixit statement is insufficient, on its own, to allow a juror to reasonably conclude that the City had an unconstitutional policy, practice, or custom.  Further, while there remain triable issues of fact as to the manner in which Cobbs was tasered and whether the K-9 remained

engaged with him at the time he was tasered, a single example of excessive force in the instant case cannot amount to an established policy, practice, or custom. *See Tuttle*, 471 U.S. at 823–24. Accordingly, plaintiff's claim must fail as a matter of law and is dismissed.

### C. Lawsuits

Finally, plaintiff contends the City was "the subject of numerous excessive force lawsuits, many involving claims of serious injuries" while Chief Paollili served as Chief of Police. Pl.'s Br. 22. Plaintiff points to nine lawsuits that were filed during Chief Paolilli's tenure, which spanned a five-and-a-half-year period (December 2004 through June 2010), each of which was voluntarily dismissed following a settlement conference. *See* Aff. of Christopher D. Watkins, Esq. in Opp'n to Mot. for Summ. J. (ECF Dkt. No. 75) ("Watkins Aff."); Watkins Aff. Ex. 9 (ECF Dkt. No. 75-9) (federal complaints filed in the Southern District of New York alleging excessive force by City of Newburgh police officers); Suppl. Aff. of Christopher D. Watkins, Esq. in Opp'n to Mot. for Summ. J. (ECF Dkt. No. 78) ("Watkins Suppl. Aff."); Watkins Suppl. Aff. Ex. 9A (ECF Dkt. No. 78-1) (additional federal complaints filed in the Southern District of New York alleging excessive force by City of Newburgh police officers). According to plaintiff, "the City systematically settled th[ese] cases," yet "never took any disciplinary action against any police officer for using excessive force," aside from a single instance where Officer Vasta was removed as a K-9 handler following an incident unrelated to any of these lawsuits. *See* Pl.'s Br. 22. In other words, according to plaintiff, as a final policymaker, Chief Paollili received numerous complaints alleging excessive force by his officers, thereby putting him on notice that the Newburgh Police Department's policies were inadequate, yet he did nothing to act on these complaints.

The court holds that plaintiff has failed to create a triable factual dispute as to whether the City established a policy or custom of excessive force that resulted in the deprivation of Cobbs's constitutional rights. Courts have made clear that, without more, a plaintiff's "citation to various lawsuits involving . . . claims for the excessive use of force is not probative of the existence of an underlying policy" of a municipality or police department. *See Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22–23 (2d Cir. 2012); *see also Clark v. Cty. of Los Angeles*, 19 F.3d 26, 26 (9th Cir. 1994) ("Lawsuits and claims are merely unsubstantiated allegations."); *Riley v. Jackson Cty. Sheriff's Dep't*, 202 F. App'x 705, 706 (5th Cir. 2006); *Walker v. City of New York*, No. 14-CV-808 (ER), 2015 WL 4254026, at *7–10 (S.D.N.Y. July 14, 2015); *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *16–17 (S.D.N.Y. Mar. 26, 2015); *Ameduri v. Vill. of Frankfort*, 10 F. Supp. 3d 320, 341 (N.D.N.Y. 2014); *Tagliaferi v. Town of Hamden*, No. 3:10 CV 1759 (JGM), 2014 WL 129223, at *12–13 (D. Conn. Jan. 14, 2014); *Howe v. Town of Hempstead*, No. 04 Civ. 0656 (DRH)(ETB), 2006 WL 3095819, at *10 (E.D.N.Y. Oct. 30, 2006); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 345–47 (E.D.N.Y. 2006). Indeed, as plaintiff concedes, each of the cited actions was dismissed without any finding of liability against the City or any officer. *See, e.g.*, *Walker*, 2015 WL 4254026, at *8 ("Here, Plaintiff fails to assert 'anecdotal evidence' of the alleged policy or custom by merely listing the names of numerous lawsuits, without indicating whether they resulted in a finding of liability against the Officers or the City or providing any specific details about the cases."); *Tieman*, 2015 WL 1379652, at *17 ("To begin, even if the civil complaints involved comparable conduct to that alleged here, 'none result[ed] in an adjudication of liability.'" (alteration in original) (quoting *Walker v. City of New York*, No. 12 Civ. 5902 (PAC), 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014)); *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) ("[T]he Court

agrees with the City that the litany of other police-misconduct cases are insufficient to make a

plausible case for *Monell* liability.").  "Simply put, the fact that there were allegations of [nine]

instances of excessive force during arrests over four [and-and-a-half] years (none of which

involved findings or admissions of culpability) during which hundreds, if not thousands, of

arrests were made does not plausibly demonstrate that the use of excessive force during arrest

was so frequent and pervasive to constitute a custom."  *Tieman*, 2015 WL 1379652, at *17

(citing *Walker*, 2014 WL 1259618, at *1–3).  Accordingly, defendants are entitled to summary

judgment on this claim.


**IV.   WRONGFUL DEATH CLAIM UNDER NEW YORK STATE LAW**

   **A.  New York State's Notice of Claim Requirements**

   Turning now to plaintiff's supplemental wrongful death claim under New York State law,

defendants argue it must be dismissed for failing to comply with New York State's notice of

claim requirements.  *See* Defs.' Br. 37–38; Defs.' Reply 15.  The New York General Municipal

Law bars suits

> against a city, county, town, village, fire district or school district for personal
> injury, wrongful death or damage to real or personal property alleged to have been
> sustained by reason of the negligence or wrongful act of such city, county, town,
> village, fire district or school district or of any officer, agent or employee thereof .
> . . unless, (a) a notice of claim shall have been made and served upon the city,
> county, town, village, fire district or school district in compliance with section
> fifty-e of this chapter, (b) it shall appear by and as an allegation in the complaint
> or moving papers that at least thirty days have elapsed since the service of such
> notice and that adjustment or payment thereof has been neglected or refused, and
> (c) the action or special proceeding shall be commenced within one year and
> ninety days after the happening of the event upon which the claim is based; except
> that wrongful death actions shall be commenced within two years after the
> happening of the death.

N.Y. Gen. Mun. Law § 50-i(1) (McKinney 2007); *see Hardy v. N.Y.C. Health & Hosp. Corp.*,

164 F.3d 789, 793–94 (2d Cir. 1999) ("Notice of claim requirements 'are construed strictly by

New York State courts.'  Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.  In sum, under New York law, if section 50-e [of the General Municipal Law] has not been satisfied (and the defendant has not waived its right to notice of claim), no damages are available." (citations omitted)); Siegel, David D., New York Practice: Practitioner Treatise Series 39 (4th ed. 2005) ("When a notice of claim requirement is statutorily imposed it is usually deemed an element of the substantive cause of action and as such its satisfaction must be pleaded in the complaint." (citing N.Y. Gen. Mun. Law § 50-i(1)).  In other words, to satisfy the State's notice of claim requirements, a complaint must specifically allege that thirty days have elapsed since the service of the notice of claim.

Subdivision 6 of section 50-e of the New York General Municipal Law, however, further states:

> At any time after the service of a notice of claim and at any stage of an action or special proceeding to which the provisions of this section are applicable, a mistake, omission, irregularity or defect made in good faith in the notice of claim required to be served by this section, not pertaining to the manner or time of service thereof, may be corrected, supplied or disregarded, as the case may be, in the discretion of the court, provided it shall appear that the other party was not prejudiced thereby.

N.Y. Gen. Mun. Law § 50-e(6).  Although plaintiff's service of her notice of claim on defendants was otherwise proper and remains uncontested, the claimed defect in plaintiff's Complaint is that she omitted any allegation that "at least thirty days have elapsed since the service of such notice [of claim] and that adjustment or payment thereof has been neglected or refused."  Consequently, defendants insist the wrongful death claim must be dismissed because "the complaint does not plead as mandated by General [M]unicipal Law § 50-i(1)(a) and (b)."  Defs.' Br. 37–38; Defs.' Reply 15.

The narrow question of whether a technical pleading violation in a complaint warrants dismissal in the context of an otherwise properly filed and served notice of claim is a question of

69

first impression for this Court. *But cf. Abato v. N.Y.C. Off-Track Betting Corp.*, No. 03 Civ. 5849 (LTS) (HPB), 2007 WL 1659197, at *10 (S.D.N.Y. June 7, 2007) (granting summary judgment in defendant's favor when a plaintiff failed to satisfy the notice and pleading requirements of New York's Racing, Pari-Mutuel Wagering and Breeding Law because he failed both to serve a formal notice as to certain claims and failed to plead compliance with the requirements in his complaint). Those courts that have been confronted with this issue have consistently held, however, that a technical pleading violation, such as for a plaintiff's failure to assert compliance with a notice of claim requirement in his or her complaint, does not require dismissal if the defendant would not be unfairly prejudiced by permitting the plaintiff to amend the complaint to allege compliance with the notice requirements. *See, e.g.*, *Trapp-Miley v. City of New York*, No. 09–CV–3993 (KAM), 2012 WL 1068102, at *16 (E.D.N.Y. Jan. 17, 2012) (citations omitted) ("[W]here, as here, plaintiffs did comply with the notice requirements but neglected to reference such compliance in their pleadings, courts have allowed them to amend their complaints to cure the 'technical error.'" (quoting *Razzano v. Cty. of Nassau*, 599 F. Supp. 2d 345, 354 (E.D.N.Y. 2009)); *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 92 n.7 (W.D.N.Y. 2009) ("[I]f plaintiff did comply with the notice requirements but failed to plead such compliance in his Amended Complaint, plaintiff is not precluded from filing an amended complaint setting forth that he complied with §§ 50-i and 50-e."); *Padilla v. Dep't of Educ. of City of N.Y.*, 90 A.D.3d 458, 459 (N.Y. App. Div. 1st Dep't 2011); *Doran v. Town of Cheektowaga*, 54 A.D.2d 178, 182 (N.Y. App. Div. 4th Dep't 1976) (explaining that the failure to allege compliance with notice requirements is "an omission [that] may be corrected or supplied in the discretion of the court if it appears that the other party will not be prejudiced thereby").

The court finds the circumstances present in this case do not warrant the dismissal of plaintiff's common law tort claim. Defendants received timely notice of the claims against them. *See* Watkins Aff. Ex. 5 (ECF Dkt. No. 75-5) (notice of claim dated September 3, 2007). That plaintiff failed to plead compliance with this requirement in her complaint is a "technical defect," forgivable under the statute in the court's discretion. *See* N.Y. Gen. Mun. Law § 50-e(6). Allowing plaintiff to amend her Complaint to correct this defect would not unfairly prejudice defendants and defendants do not claim otherwise. *Cf.* Defs.' Br. 37–38. Thus, the court, in its discretion, grants plaintiff leave to amend her Complaint for the limited purpose of curing the section 50-i and section 50-e defects.

### B.  Plaintiff's Wrongful Death Claim

As to the merits of plaintiff's wrongful death claim, under New York State law, to prevail on such a claim:

> a plaintiff must establish (1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent.

*Garcia*, 43 F. Supp. 3d at 298–99 (quoting *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 683 (E.D.N.Y. 2013)) (internal quotation marks omitted). Defendants' sole response to plaintiff's wrongful death claim is that Cobbs's death was not caused by the Officers' use of force. *See* Defs.' Br. 12. Rather, according to defendants, Cobbs died as a result of "excited delirium," the high levels of intoxication from PCP, cocaine, lorazepam, and midazolam, and from cardiac hypertrophy. *See* Defs.' Br. 12–13 (citing Medical Examiner Report 5).

A plaintiff can establish causation by showing that a "defendant's negligence was a substantial cause of the events which produced the injury." *Schipani v. McLeod*, 541 F.3d 158,

162–63 (2d Cir. 2008) (quoting *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670

(N.Y. 1980)).  A plaintiff need not, however, "demonstrate that a defendant's negligence or

recklessness was the *sole cause* of his injuries."  *Garcia*, 43 F. Supp. 3d at 299 (emphasis added)

(citing *Wolfe v. Samaritan Hosp.*, 484 N.Y.S.2d 168, 171 (N.Y. App. Div. 3d Dep't 1984)).

Here, the court finds there is record evidence from which a reasonable juror could

conclude that defendants' use of force was a "substantial cause" of Cobbs's death.  *See Schipani*,

541 F.3d at 162–63.  In his autopsy report, Dr. Thanning concluded that the "immediate cause"

of death was "multi-organ shock with exsanguination," and that the "proximate cause" of death

was "multiple blunt and electric force injuries (contusions, lacerations; consistent with canine

bite marks, and taser burn abrasions)."  *See* Thanning Autopsy Report 8.  Defendants would have

the court credit the Medical Examiner Report instead, in which Dr. Roh concluded that Cobbs

died as a result of "Excited Delirium; Acute Mixed Drug Intoxication (Phencyclidine, Cocaine,

Lozazepan and Midazolam); Cardiac Hypertrophy."  *See* Medical Examiner Report 5; Defs.' Br.

12–13.  At summary judgment, however, the court is not free to pick and choose from the record

evidence.

Moreover, the manufacturer of the taser used by Officer Buckley had issued a warning of

associated health risks, specifically as a result of prolonged or continuous application of the

taser, which can cause, among other things, breathing impairments and sudden in-custody death.

*See* Watkins Aff. Ex. 8, at 3 (ECF Dkt. No. 75-8) (TASER International's "Product Warnings—

Law Enforcement" dated March 1, 2007) ("Taser Warning") ("When practical, avoid prolonged

or continuous exposure(s) to the TASER device's electrical discharge.  In some circumstances,

in susceptible people, it is conceivable that the stress and exertion of extensive repeated,

prolonged, or continuous application(s) of the TASER device may contribute to cumulative

exhaustion, stress, and associated medical risk(s).”); *see also* DOJ Taser Report 4 (“A preliminary review of deaths following [taser] exposure found that many are associated with continuous or repeated shocks.  There may be circumstances in which repeated or continuous exposure is required, but law enforcement officers should be aware that the associated risks are unknown.  Therefore, caution is urged in using multiple activations.”).

Indeed, in describing signs that the use of the taser on a suspect might result in death, the manufacturer lists “extreme agitation, bizarre behavior, . . . imperviousness to pain, paranoia, exhaustive exertion, ‘superhuman’ strength, hallucinations, [and] sweating profusely,” many of which were conditions displayed by Cobbs and observed by the Officers in this case.  *See* Taser Warning 2 n.2.  Thus, viewing the evidence in the light most favorable to plaintiff, a reasonable juror could determine that, although there were multiple factors contributing to Cobbs’s death, the force used by the Officers (i.e., the use of the K-9 dog, the firing of the taser, and physical strikes) was a “substantial cause.”  *See Garcia*, 43 F. Supp. 3d at 285 (“[A] jury could reasonably determine based on the autopsy report and other record evidence that firing the taser was a significant factor contributing to Healy’s death and that defendants are therefore liable on plaintiff’s wrongful death claim.”).  Accordingly, summary judgment is inappropriate on this claim.

## CONCLUSION

For the foregoing reasons, the court hereby (1) GRANTS summary judgment in defendants’ favor on plaintiff’s claim for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the City of Newburgh pursuant to 42 U.S.C. § 1983; (2) GRANTS summary judgment in defendants’ favor on all claims against Officer Flaherty and Officer Jenerose; (3) DENIES defendants’ motion for summary judgment

on plaintiff's § 1983 excessive force and failure to intervene claims against Sergeant Murphy,

Officer Ladlee, Officer Buckley, and Officer Vasta; (4) DENIES defendants' motion for

summary judgment on plaintiff's supplemental wrongful death claim under New York State law;

and (5) DISMISSES Officer Flaherty and Officer Jenerose as defendants in this action.

It is SO ORDERED.

Dated:        December 17, 2015
              New York, New York


                                        /S/        Richard K. Eaton
                                                       Judge